MICHAEL DIGIOVANNA *v.* DONNA ST. GEORGE
(SC 17624)

Rogers, C. J., and Norcott, Katz, Palmer, McLachlan and Eveleigh, Js.

---

Argued October 18, 2010—officially released January 5, 2011*

* January 5, 2011, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Lori Welch-Rubin,* for the appellant (plaintiff).

*Susan King Shaw,* for the appellee (defendant).

*Opinion*

KATZ, J. In *Roth* v. *Weston,* 259 Conn. 202, 789 A.2d 431 (2002), this court held that the legislature could, consistent with due process, authorize a nonparent to obtain visitation with a minor child over a fit parent's objection if the nonparent alleges and proves by clear and convincing evidence that he or she has a parent-like relationship with the child and that the child would suffer harm akin to abuse and neglect if that relationship is not permitted to continue. The present case calls on this court to consider whether a trial court may deny a nonparent's application for visitation when the applicant has met this stringent burden of proof if that court concludes that visitation nonetheless is not in the best interest of the child. Specifically, the plaintiff, Michael DiGiovanna, appeals from the trial court's judgment denying his application for visitation with the minor child of the defendant, Donna St. George, on the ground that, although the plaintiff had met his burden of proof under *Roth,* visitation ultimately would not be in the

child's best interest because the defendant would react to that situation by inflicting greater psychological harm on the child than that which would result from the denial of visitation.[1] We conclude that such a conclusion was improper. Accordingly, we reverse the judgment.

The record reveals the following undisputed facts and procedural history. The plaintiff and the defendant began to date in 1987, at which time the defendant had a sixteen month old daughter, Alexandria. Although the parties had planned to marry in October, 1993, shortly before that date, their wedding was called off and the relationship was terminated. In 1994, the defendant met Thomas Kreis, and the two were married in 1995. Following the marriage, Kreis, who was employed at the University of Geneva, resided in Switzerland, while the defendant remained in Connecticut. In 1995, the plaintiff and the defendant resumed their relationship, at which time the defendant was pregnant by Kreis. In 1996, when the defendant gave birth to her son, Eric, the plaintiff was at her side. The plaintiff and the defendant did not reside together, but they maintained their relationship and the relationship between the plaintiff and the defendant's children for the next two years. Kreis periodically came to Connecticut to see the defendant and the children.

In 1998, when Eric was two years old, Kreis died in a plane crash. The defendant, who subsequently was treated for post-traumatic stress disorder and depression, ended her relationship with the plaintiff around this time. She nonetheless permitted Eric and Alexandria to maintain their relationship with the plaintiff over the next four years. In 2001, the defendant began a relationship with another man, who later moved into

---

[1] The plaintiff appealed from the trial court's judgment to the Appellate Court, and we thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

the defendant's house and with whom the defendant had her third child. In September, 2002, the plaintiff wrote to the defendant's psychiatrist expressing concerns that the defendant had been abusive to Eric. Shortly thereafter, the defendant cut off contact between the plaintiff and Eric, but permitted the plaintiff to maintain his relationship with Alexandria. The defendant terminated that contact in 2003, after she learned that the plaintiff intended to seek court-ordered visitation with Eric and obtained legal advice that she should not treat the children differently.

In August, 2003, the plaintiff filed an application, pursuant to General Statutes § 46b-59,[2] for visitation with Eric and Alexandria, then ages seven and seventeen, respectively. He alleged that, with the encouragement of the defendant, he had functioned as a father to her children and that terminating this relationship would cause serious and irreparable harm to them. He further alleged that the defendant was psychologically unstable and that he had provided the only stability in the children's lives. While the application was pending, Alexandria turned eighteen years of age, and the plaintiff thereafter withdrew his request for court-ordered visitation with her.

[2] General Statutes § 46b-59 provides: "The Superior Court may grant the right of visitation with respect to any minor child or children to any person, upon an application of such person. Such order shall be according to the court's best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable, provided the grant of such visitation rights shall not be contingent upon any order of financial support by the court. In making, modifying or terminating such an order, the court shall be guided by the best interest of the child, giving consideration to the wishes of such child if he is of sufficient age and capable of forming an intelligent opinion. Visitation rights granted in accordance with this section shall not be deemed to have created parental rights in the person or persons to whom such visitation rights are granted. The grant of such visitation rights shall not prevent any court of competent jurisdiction from thereafter acting upon the custody of such child, the parental rights with respect to such child or the adoption of such child and any such court may include in its decree an order terminating such visitation rights."

To assist the court in determining whether the plaintiff had met the standard for obtaining visitation with Eric as set forth in *Roth*, the trial court ordered Kenneth Robson, a child and adolescent psychologist, to evaluate the parties and Eric. The parties thereafter stipulated to have Robson's evaluation address: the nature of the relationship between the plaintiff and Eric; the harm, if any, to Eric from the termination, continued cessation and potential reinstatement of the relationship; practical ways to mitigate any harm from the termination of the relationship; and the fitness of the defendant as a mother.

Following the close of evidence, the court concluded that Robson's testimony had raised serious questions about the mental health of both the defendant and the plaintiff to which the court needed answers before it could render a decision. The court therefore ordered the evidence to be reopened "in the best interest" of Eric and appointed Anne M. Phillips, a clinical psychologist, to conduct a further evaluation. Specifically, the court ordered Phillips to address the following questions:

"a. Is the plaintiff's relationship with the child a vehicle for the plaintiff to continue his relationship with the defendant?

"b. Are the plaintiff's feelings toward the child appropriate as between a child and an adult or has the plaintiff substituted the child for an adult relationship?

"c. How will the defendant react to continued contact between the plaintiff and the child? How will the defendant react to continuing contact with the plaintiff (if ordered by the court) in front of the minor child?"

With respect to the first and second questions, Phillips' report concluded that the plaintiff's relationship with Eric was neither a substitute for his relationship

with the defendant nor inappropriate. With respect to the third set of questions, the report provides: "[The defendant] evidences marked deficits in her capacity for emotional and behavioral control. Her assertions that she will make no attempt to constrain her opposition and, indeed, will intensify her opposition, in the face of continued contact, is entirely credible. [The defendant] evidences neither the intention nor the capacity to constrain her behavior to external guidelines with issues of intense importance to her. She is likely to react with an intensification of opposition should such access occur. [The defendant] currently evidences limited awareness, or inclination, to limit her negative remarks about and to her two older children regarding issues both related to [the plaintiff] and separate from him. There is no evidence [that] the [defendant] would react positively in front of her son with respect to his having renewed access to [the plaintiff]."[3]

On January 26, 2005, the trial court issued an oral decision stating the following findings and conclusions as the basis for its decision denying the plaintiff's application for visitation. "The court is going to make a finding that the plaintiff has proven by clear and convincing evidence that he had a parent-like relationship between Eric and himself. He acted as a father figure to Eric with [the] encouragement and consent of the defendant. [The plaintiff] was present for the child's birth and his participation in Eric's life was probably

---

[3] Phillips also testified: "My conclusion was that [the defendant] would maintain and probably escalate her opposition to contact between [the plaintiff] and her son. She was quite vehement that she would leave the country rather than allow such contact to happen. . . . I found it credible that she would intensely oppose any contact. Whether or not she would leave the country, I don't know. . . . [The defendant] seems neither capable nor motivated to change her opposition to Eric's relationship with [the plaintiff]. She is already somewhat discontrolled in her interpersonal relationships and there is likely significant peril to Eric in terms of the cost to his relationship with [the defendant] for him to have contact with [the plaintiff]."

far beyond what most divorced fathers would do. He saw the child on a regular basis, shared vacations with him, had him overnight at his house once or more times per week.

"The court is also going to make a finding that [the defendant's] denial of visitation has and will cause Eric actual and significant damage. [The plaintiff] has been a stabilizing presence in what has been a somewhat chaotic life of Eric. [Eric] has two half-siblings. His father died when he was two years old. His mother, according to both [experts'] reports, has suffered from psychological impairments. [The plaintiff] has been a safe harbor and a place where the child could go for comfort and safety.

"The court finds absolutely no credence in the defendant's allegations that there was anything improper about the relationship between [the plaintiff] and either of the children at issue. [The plaintiff] may not be the biological parent of these children, but like an adoptive parent, the court believes he truly loves these children as if they were his own.

"The third prong of *Roth* requires the court to determine whether the harm that the child will suffer is akin to that [which] might be characterized as neglected, uncared for, or dependent. The court is making a finding that depriving Eric of the stabilizing relationship would put him in the position like that of a child who is neglected, uncared for, or dependent. Therefore, I'm making a finding that the plaintiff has satisfied all prongs of the *Roth* test.

"However, the reason I asked for the psychological evaluation is, despite the fact that the plaintiff has met every element of *Roth*, the court was very concerned about the impact on Eric of the defendant's behavior. During the course of these proceedings, the court was able to observe the demeanor of the defendant, heard

her testimony, and was able to draw its own conclusions. Those conclusions were corroborated by . . . Phillips' testimony.

"The bottom line in this case is, despite the fact that every element of *Roth* has been satisfied by the plaintiff, I believe it is not in Eric's best interest to continue a relationship with [the plaintiff]. I'm sorry I have to say that, but I believe that [the defendant] will take it out on Eric. I don't believe she has the emotional control or the capacity not to psychologically harm her child if the court approves that this relationship continue. I wish the court had the power to order parents to behave in a way that is not psychologically injurious to their children. However, I cannot control what goes on in the privacy of one's home.

"Based on the two psychological reports, I don't believe that [the defendant] has the capacity to put Eric's needs in front of her own.[4] She is currently so angry and out of control regarding her feelings about [the plaintiff] that I believe those feelings would be taken out against Eric. . . . I simply cannot put a seven or eight year old child in a position where every time he has a visit, he is going to come home to hostility and anger and perhaps mistreatment."

In response, the plaintiff argued that the court's finding of harm akin to abuse or neglect, by clear and convincing evidence, required it either to issue the visitation order or to put into effect some kind of supervision or protective regime by the department of children and families (department). The court rejected this suggestion. It reasoned that there is a distinction between

---

[4] With respect to this issue, Robson's report stated: "[Eric] is pinioned between [the defendant] and [the plaintiff] in a situation that does not lend itself to repair; that is, the relationship between [the plaintiff] and [the defendant] cannot and should not be worked on in this evaluator's opinion. There is enough evidence that it is broken and cannot be fixed."

the requisite finding under *Roth*—harm "akin to" the neglected, uncared for, dependent standard under General Statutes § 46b-120 or General Statutes § 46b-129— and a finding that this standard "actually" had been met. The court concluded that "the overriding obligation of the court is to see [that] the child's best interest is protected. Even going through all of the *Roth* standards and finding that they were all proven by clear and convincing evidence, the court cannot see fit to award any visitation because the real damage will come as a result of that visitation. I think [the defendant] does not have the capacity to control her feelings and emotion. When the child comes and goes from that visitation, he will take the brunt of her uncontrollable emotion and anger as opposed to [the plaintiff]. If there is no visitation, I don't believe that the child is going to be emotionally abused by [the defendant]. I do have some concerns based on . . . Phillips' report, but they don't rise to the level of needing [the department's] involvement. I see it as a potential." The trial court thereafter rendered judgment in accordance with its decision denying the plaintiff's application, and this appeal followed.

The plaintiff contends that, because he had met the *Roth* standard, the trial court improperly denied visitation on the basis of the defendant's presumed harmful response to such an order. He contends that the court had authority to order the defendant to undergo counseling to address such reactions. The plaintiff further contends that the trial court's application of § 46b-59 was unconstitutional in the present case because he established the requirements that this court had engrafted onto that statute in *Roth* to satisfy the demands of due process. In connection with this argument, the plaintiff contends that this court should: (1) recognize that Eric has an independent right to associate with the plaintiff under the state and federal constitutions; (2) recognize the primacy of a child's liberty

interest over his or her parent's interest when, to the substantial detriment of the child, the parent terminates a relationship that the parent has encouraged between the child and a third party; and (3) reconsider the *Roth* factors and recognize de facto parenting.

We conclude that the trial court improperly determined that the best interest of the child standard can overcome the *Roth* standard for ordering visitation. We further conclude that the trial court improperly failed to consider and to invoke its authority to issue orders to compel the defendant's compliance with any such visitation order. Therefore, the trial court improperly denied the plaintiff's application. Accordingly, we need not consider the plaintiff's claims relating to the adoption of new constitutional or common-law standards.

Before turning to the merits of the plaintiff's appeal, we note that the defendant has contended in her brief to this court that the trial court improperly found that the plaintiff had established the existence of a parent-like relationship and the requisite harm under *Roth* to impose an order of visitation with a nonparent. See *Roth* v. *Weston*, supra, 259 Conn. 234–35. The defendant does not challenge either finding as clearly erroneous. Rather, she contends that the trial court applied an improper standard in reliance on these findings and seeks plenary review. To the extent that the defendant claims that the trial court should have credited certain evidence over other evidence that the court did credit, it is well settled that such matters are exclusively within the province of the trial court. See *Slack* v. *Greene*, 294 Conn. 418, 430–31, 984 A.2d 734 (2009); *W.* v. *W.*, 256 Conn. 657, 660, 779 A.2d 716 (2001). To the extent, however, that the defendant claims that, before determining that the *Roth* standard had been met, the trial court was required to consider the harm to Eric that would be caused by granting the petition and to find that the defendant was unfit, we agree that these

issues are not dependent on a challenge to the trial court's factual findings. Although the defendant should have presented these claims to the court as alternate grounds for affirmance in a preliminary statement of issues pursuant to Practice Book § 63-4 (a) (1), we nonetheless consider them because the plaintiff adequately has responded to them in his reply brief and therefore is not prejudiced by this procedural defect. See *Gerardi* v. *Bridgeport*, 294 Conn. 461, 466, 985 A.2d 328 (2010). Therefore, we treat as uncontested the trial court's findings that the plaintiff alleged and proved the *Roth* factors by clear and convincing evidence. Accordingly, except as otherwise noted, this appeal turns on the question of whether the trial court correctly applied the law, an issue over which we exercise plenary review. *Maturo* v. *Maturo*, 296 Conn. 80, 88, 995 A.2d 1 (2010).

This court's decision in *Roth* v. *Weston*, supra, 259 Conn. 202, provides the lens through which we view the trial court's decision in the present case. In *Roth*, we confronted a facial constitutional challenge to the broad terms under which the legislature had permitted visitation to be granted under § 46b-59 over a fit parent's objection. Id., 205. The statute provided that the court could permit "any person" to obtain visitation if it is in "the best interest of the child . . . ." General Statutes § 46b-59. This court acknowledged that parents have a constitutionally protected right to make decisions relating to the care and upbringing of their children and a concomitant right to control their children's associations. *Roth* v. *Weston*, supra, 216–17. We further acknowledged "that courts must presume that fit parents act in the best interests of their children, and that so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the [s]tate to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of

that parent's children." (Internal quotation marks omitted.) Id., 216. We recognized, however, that there are circumstances in which interests arise that outweigh the parents' fundamental right to make decisions relating to their child. For instance, it was well settled that the state has the right to intervene to protect a child from an unfit parent, as demonstrated by abuse or neglect. Id., 224. We noted that "[a] more difficult issue is whether the child's own complementary interest in preserving relationships that serve his or her welfare and protection can also constitute a compelling interest that warrants intruding upon the fundamental rights of parents to rear their children. . . . Specifically, we consider whether something less than an allegation and proof in support of abuse, neglect or abandonment will suffice to permit an intrusion." (Citations omitted.) Id., 225.

In resolving that issue in *Roth*, we stated: "We can envision circumstances in which a nonparent and a child have developed such substantial emotional ties that the denial of visitation could cause serious and immediate harm to that child. For instance, when a person has acted in a parental-type capacity for an extended period of time, becoming an integral part of the child's regular routine, that child could suffer serious harm should contact with that person be denied or so limited as to seriously disrupt that relationship. Thus, proof of a close and substantial relationship and proof of real and significant harm should visitation be denied are, in effect, two sides of the same coin. Without having established substantial, emotional ties to the child, a petitioning party could never prove that serious harm would result to the child should visitation be denied. This is as opposed to the situation in which visitation with a third party would be in the best [interest] of the child or would be very beneficial. The level of harm that would result from denial of visitation in

such a situation is not of the magnitude that constitutionally could justify overruling a fit parent's visitation decision. Indeed, the only level of emotional harm that could justify court intervention is one that is akin to the level of harm that would allow the state to assume custody under . . . §§ 46b-120 and 46b-129—namely, that the child is 'neglected, uncared-for or dependent' as those terms have been defined." Id., 225–26. Thus, in *Roth*, we substituted the parent-like relationship and substantial harm elements for the statutory elements of "any person" and " best interest of the child," respectively, as a judicial gloss to § 46b-59 to remedy the constitutionally infirm language.[5] Id., 234–35.

Our reasoning in *Roth* demonstrates several principles that are relevant to the present case. First, the court constitutionally may compel a parent to preserve a relationship between a child and a third party, even in the face of strong parental opposition, when the cessation of that relationship would cause substantial

---

[5] The *Roth* standard for visitation necessarily differs from the one applied when a third party seeks to intervene in a custody proceeding brought pursuant to General Statutes § 46b-56. A third party seeking custody over a parent's objection must demonstrate "that he or she has a relationship with the child akin to that of a parent, that parental custody clearly would be detrimental to the child *and, upon a finding of detriment, that third party custody would be in the child's best interest.*" (Emphasis added.) *Fish* v. *Fish*, 285 Conn. 24, 89, 939 A.2d 1040 (2008). We retained the best interest element as part of the custody analysis because the detriment element in such cases considers only the effect of continuing the existing relationship between the parent and the child, not the result of forging a more substantial relationship between the third party and the child. See id., 47 ("The harm alleged in a visitation petition results from the child's lack of access to the petitioner rather than from the parent-child relationship, which is deemed to be beneficial. . . . In contrast, the harm alleged in a third party custody petition arises from the fundamental nature of the parent-child relationship, which may be emotionally, psychologically or physically damaging to the child." [Citation omitted.]). The best interest element in custody cases therefore is necessary to consider whether the third party is an appropriate person with whom to vest custody, whereas the harm element in visitation cases essentially resolves that question.

harm to the child. Second, the applicant's establishment of the requisite relationship and harm if that relationship is not preserved necessarily exceeds what would have satisfied the best interest of the child standard. Third, although we crafted the standard in *Roth* specifically to address circumstances in which court intervention is required to compel an unwilling parent to allow visitation, fully mindful of the hostility that may exist between parties to such cases, we did not state or give any basis to infer that the parent's opposition, or the effect thereof, should have any bearing on whether the applicant may obtain visitation. Fourth, because the requisite harm for obtaining visitation over a fit parent's objection is akin to, but falls short of, the neglected, uncared-for or dependent standard for intervention by the department, parents unsuccessfully may oppose visitation without necessarily being unfit or in need of such intervention.

In sum, our decision in *Roth* determined that, once the trial court concludes that the applicant has established the requisite elements of the parent-like relationship and substantial harm akin to abuse or neglect if visitation were denied, the court necessarily has determined that visitation with that applicant is appropriate and should be ordered. What we did not address in that case, and what the present case gives us an opportunity to clarify, is that the best interest of the child determines *how* that order of visitation should be implemented.

In the present case, the trial court found that the plaintiff had met his burden of proof under *Roth*. The trial court nonetheless denied his application because, even though it would cause harm akin to abuse or neglect to deprive Eric of his relationship with the plaintiff, the defendant would inflict even greater harm on Eric if the court were to allow visitation. In other words, the trial court concluded that it would be in Eric's best interest to deny visitation to the plaintiff. In light of

the aforementioned principles, this conclusion not only conflicts with *Roth*, but is improper for other reasons.

The defendant was the party causing substantial harm to her child, either by depriving Eric of his relationship with the plaintiff or by demonstrating that she would inflict even greater harm on Eric should she be ordered to permit that relationship to continue. The trial court's order, in effect, sanctioned the defendant's infliction of harm akin to abuse or neglect and allowed her to prevail in a case in which she had lost on the merits. The trial court stated: "I wish the court had the power to order parents to behave in a way that is not psychologically injurious to their children. However, I cannot control what goes on in the privacy of one's home." These statements suggest that the trial court concluded that it had no authority to compel the defendant to undertake steps that could allow her to comply with the visitation order. Such a conclusion would be improper as a matter of law.

The trial court did not expressly consider its authority under what is now General Statutes § 46b-56 (i).[6] That statute would have allowed the court to order the defendant to undergo counseling to aid her in coming to terms with the court's decision. See *Foster* v. *Foster*, 84 Conn. App. 311, 323, 853 A.2d 588 (2004) (concluding that court had statutory authority to order plaintiff to undergo postjudgment counseling in custody case); see

---

[6] General Statutes § 46b-56 (i) provides: "As part of a decision concerning custody or visitation, the court may order either parent or both of the parents and any child of such parents to participate in counseling and drug or alcohol screening, provided such participation is in the best interests of the child."

We note that, since the time of the trial court's order in the present case, January, 2005, § 46b-56 was amended by, inter alia, the addition of new subsections and the redesignation of other existing ones. See Public Acts 2005, No. 05-258, § 3 (among other changes, redesignating former subsection [g] as subsection [i]). Because any reconsideration of the visitation issue on remand will be governed by the current revision of § 46b-56, we refer to the codification therein.

also *Roth* v. *Weston*, supra, 259 Conn. 209 (noting that, in response to defendant father's hostility to children having any visitation with maternal grandmother and aunt, trial court had ordered all parties to participate in separate counseling sessions with court-appointed psychologist until such time as psychologist determined that counseling no longer was necessary).[7] That statute also would have provided authority for the court, in its discretion, to order counseling for Eric both to ameliorate and to monitor the defendant's actions.

The court also did not expressly consider other tools in its arsenal to effectuate visitation. As in other cases in which courts have been faced with parties intensely opposed to visitation, the trial court could have prescribed specific conditions under which visitation would take place to address legitimate concerns of either party.[8] Although it involved a visitation dispute between a grandmother guardian and a child's cousin, we find instructive the trial court's decision in *In re Kenneth W.*, Superior Court, judicial district of Fairfield, Docket No. CV03-040 43 11 S (April 11, 2005) (39 Conn.

---

[7] We note that some other jurisdictions employ the same counseling tool. See, e.g., *Babin* v. *Babin*, 854 So. 2d 403, 411 (La. App.) (noting that trial court had ordered grandparent and parent to undergo counseling in case where parent objected to visitation), cert. denied, 854 So. 2d 338 (La. 2003), cert. denied sub nom. *Babin* v. *Darce*, 540 U.S. 1182, 124 S. Ct. 1421, 158 L. Ed. 2d 86 (2004); *Herrick* v. *Wain*, 154 Md. App. 222, 229, 838 A.2d 1263 (2003) (noting that trial court had ordered grandparent and father to undergo counseling, under reasoning that "[w]ith counseling, the two adults who are most important in these children's lives may be able to subordinate their own needs and feelings to those of the children"), overruled in part on other grounds by *Koshko* v. *Haining*, 398 Md. 404, 921 A.2d 171 (2007); *Soohoo* v. *Johnson*, 731 N.W.2d 815, 826 (Minn. 2007) (concluding that trial court had abused its discretion in requiring mother to undergo counseling "in the absence of a factual finding that such counseling is in the best interests of the children as opposed to [the parent]").

[8] For example, the defendant had expressed concerns that the plaintiff had attempted to buy the children's affections by excessively spending money on them and buying them toys and gifts. The trial court could have limited the circumstances under which the plaintiff could buy things for Eric.

L. Rptr. 113). In that case, the trial court had noted, "[w]hile the animosity between the grandmother and the child's cousin could be detrimental to the child, termination of the cousin's rights of visitation is neither the only nor the appropriate remedy." Id., 114. The trial court ordered the following measures to be undertaken while visitation continued: "Both the [g]randmother and [the] child's cousin are to cooperate in appropriate counseling sessions geared toward the cessation of the animosity between the parties or, at the least, minimizing the possibility that such animosity will have a negative impact upon the child"; id.; "[n]either party is to make any disparaging or negative comment about the other party within the hearing of the child"; id.; "[n]either party is to discuss the court's proceedings regarding custody, guardianship or visitation within the hearing of the child"; id.; and "[there] shall be no verbal exchanges between the parties during those times that the child is either picked up or dropped off at the grandmother's home." Id.

Finally, we note that the trial court in the present case did not expressly consider that, should the defendant fail to comply with such orders, it could have used its contempt powers to coerce her compliance.[9] Indeed, to the extent that, despite such actions, a parent would continue to inflict harm on her child that exceeds that which is "akin to" the neglected, uncared-for and dependent standard, a court properly could deem that parent to no longer be presumptively fit. As such, the court may consider whether to order intervention by the department.

Alternatively, we are mindful that there is some language in the trial court's decision to suggest the possibil-

---

[9] We note that courts in other jurisdictions have held parents in contempt in nonparent visitation cases. See, e.g., *McMillin* v. *McMillin*, 6 So. 3d 414, 420–21 (La. App. 2009) (affirming judgment of contempt for mother's failure to comply with grandparent visitation order); *Erwin* v. *Erwin*, Ohio Court of Appeals, Docket No. 9-08-15, 2009-Ohio-407 (February 2, 2009) (same).

ity that the court may not have concluded that it *lacked* authority to compel the defendant's compliance, but, rather, that it would have been *futile* to employ these tools. Specifically, the court twice stated its view that the defendant lacked the "capacity" not to psychologically harm her child if the court ordered visitation. Such a factual finding as to futility would not only be unsupported by the evidence; see *Simms* v. *Simms*, 283 Conn. 494, 502, 927 A.2d 894 (2007) ("[t]he well settled standard of review in domestic relations cases is that this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts" [internal quotation marks omitted]); but also would not, as a matter of law, justify denying visitation.

First, neither Phillips nor Robson was asked to consider to what extent, if any, counseling or other actions by the court could ameliorate the defendant's presumed harmful response should visitation be granted. Robson was asked to form an opinion as to whether the harm from the *cessation* of the relationship between the plaintiff and Eric could be ameliorated, but was not asked a similar question relating to the *resumption* of the relationship. Although Phillips had stated that the defendant lacked the "capacity" to constrain her behavior, that opinion was in response to the general question of how the defendant would react in front of Eric to an order continuing contact with the plaintiff.

Second, even if these experts had expressed an opinion that none of the tools available to the court would have any impact on the defendant's harmful conduct, it still would have been improper, as a matter of law, for the court to deny visitation to the plaintiff. The plaintiff had met his burden of proof. If there was evidence that the defendant would inflict harm on Eric that clearly exceeded the harm that would be caused

by denying visitation with the plaintiff, intervention by the department might be justified.

Finally and significantly, there are policy considerations that weigh heavily against adopting the trial court's approach. That approach would create a powerful incentive in every visitation contest for a parent to threaten to create a hostile environment if visitation is ordered and to communicate an unwillingness to act otherwise. In essence, we would allow a recalcitrant parent to thwart the legislature's intent expressed in the visitation statute, and in so doing, allow a parent's threat, whether real or contrived, to severely harm his or her child. Such a loophole would wholly undermine the careful balance struck by this court in *Roth* between the preservation of a parent's "interest in the care, custody and control of his or her children"; *Roth* v. *Weston*, supra, 259 Conn. 218; and the critical protection of children from "real and substantial emotional harm . . . [that] presents a compelling state interest . . . ." Id., 226. We cannot sanction such a result.

It is important to underscore, however, that we do not intend to suggest that the best interest of the child is irrelevant after the applicant meets his or her burden of proof under *Roth*. To the contrary, whereas the *Roth* factors establish that there is a relationship that is entitled to be fostered, the best interest of the child guides the court in determining how best to foster that relationship. Those considerations may indicate, as we previously have discussed, counseling, as well as restrictions on the time, place, manner and extent of visitation.

Therefore, we conclude that, because the trial court found that the plaintiff had met the *Roth* standard, it improperly denied the plaintiff's application for visitation. Significantly, however, seven years have lapsed

since the plaintiff initiated this action.[10] Upon remand, the trial court is free to consider that fact when crafting a visitation order consistent with Eric's best interest. Cf. *In re Shanaira C.*, 297 Conn. 737, 763, 1 A.3d 5 (2010) (concluding that, in light of three and one-half years lapse since trial court rendered custody order that was reversed on appeal, trial court should consider child's best interest at time of new dispositional hearing).

The judgment is reversed and the case is remanded with direction to render judgment in favor of the plaintiff and to conduct a new dispositional hearing.

In this opinion ROGERS, C. J., and NORCOTT and McLACHLAN, Js., concurred.

---

[10] The extended period of time that lapsed between the trial court's oral decision and our resolution of this matter resulted from the following delays. In its January, 2005 oral decision, the trial court stated that it intended to issue a written decision for purposes of potential appellate review, but would render a decision orally because of the importance of putting the matter to rest. On November 21, 2005, having not received a written decision, the plaintiff filed a motion seeking to have the trial court either issue a written decision or issue its oral decision as its final decision and establish an effective date of final decision so the parties could exercise their appellate rights. Thereafter, the court signed the transcript of its oral decision as its final decision and rendered judgment on November 22, 2005. More than two and one-half years later, on June 9, 2008, the plaintiff filed a motion seeking permission to file a late appellate brief, which the appellate clerk's office granted. The defendant thereafter filed eight separate motions seeking extensions of time to file her appellate brief, which the clerk's office also granted. After the defendant filed her brief on April 27, 2009, the plaintiff obtained three extensions of time to file his reply brief, which finally was filed on July 9, 2009.

In response to an inquiry at oral argument by a member of this court regarding the seven year delay between the plaintiff's initiation of this action and the date of the oral argument on this appeal, the plaintiff's counsel asserted that this delay stemmed in part from the fact that the parties unsuccessfully had been pursuing a settlement. It is this court's opinion that this delay was unconscionable and undoubtedly contrary to the best interest of the child, a matter that should have been the paramount priority of the parties, their counsel and the court. Although there is plenty of blame to share, we underscore that it is the sacrosanct obligation of both the courts and the parties to these types of disputes to take all necessary steps to resolve such matters promptly.

PALMER, J., dissenting. I agree generally with Justice Eveleigh's dissent. I write separately, however, to explain the crux of my disagreement with the majority's conclusion that the trial court's determination that it would be in Eric's[1] best interest to deny visitation with the plaintiff, Michael DiGiovanna, "conflicts" with the standard set forth in *Roth* v. *Weston*, 259 Conn. 202, 789 A.2d 431 (2002), for determining when third party visitation may be granted under General Statutes § 46b-59. Although it is true, as the majority maintains, that the trial court expressly found that the plaintiff had met his burden of proof under *Roth*, that finding cannot be viewed in a vacuum; rather, it must be considered together with the trial court's subsequent finding that it was not in Eric's best interest to continue a relationship with the plaintiff. It is apparent that the trial court believed that, for purposes of applying *Roth*, it was bound to consider the *Roth* requirements without regard to whether the harm that Eric would suffer if deprived of visitation with the plaintiff—a deprivation that the court found satisfied the *Roth* standard—was greater or lesser than the harm that Eric would suffer if the plaintiff was permitted visitation. It also is clear, however, that the trial court found that the harm that Eric would suffer if visitation were ordered was greater than the harm that he would suffer if visitation were not ordered. Viewing the court's *Roth* analysis from that perspective, it is evident that, on the basis of the trial court's factual findings—none of which is clearly erroneous—the court effectively found that, but for the predictable negative reaction of Eric's mother, the defendant, Donna St. George,[2] to the plaintiff's visitation, the *Roth* requirements had been met. Although I believe that it would have been preferable for the court

---

[1] Eric is the son of the defendant, Donna St. George.

[2] See footnote 1 of this opinion.

to have viewed the visitation question as two sides of the same coin—if the court had considered the issue in that manner, it would have concluded that the *Roth* standard had *not* been met—I also am persuaded, on the basis of the totality of its findings and analysis, that the court reasonably rejected the plaintiff's application for visitation upon consideration of all the relevant facts and circumstances.

In *Roth*, this court reaffirmed that "[t]he constitutionally protected interest of parents to raise their children without interference undeniably warrants deference and, absent a powerful countervailing interest, protection of the greatest possible magnitude. . . . Consequently, interference is justified only when it can be demonstrated that there is a compelling need to protect the child from harm. In the absence of a threshold requirement of a finding of real and substantial harm to the child as a result of the denial of visitation, forced intervention by a third party seeking visitation is an unwarranted intrusion into family autonomy." (Citations omitted.) Id., 228–29. Thus, we emphasized that the dispositive question for purposes of third party visitation is not whether the child will be harmed if visitation is granted; the issue, instead, is whether the child will be significantly harmed if visitation is *denied*. Id., 238. Furthermore, the petitioner "must prove [that the child will be harmed if visitation is denied] by clear and convincing evidence. Only if that enhanced burden of persuasion has been met may the court enter an order of visitation." Id., 235. In the present case, although the court found that Eric would suffer harm if visitation with the plaintiff were denied, the trial court also found that "real damage will come" to Eric if visitation were granted—a finding supported by the testimony of the two court-appointed psychologists and Eric's guardian ad litem. I therefore agree with the guardian ad litem's statement to this court that the trial court's memoran-

dum of decision, although not a model of clarity, "is consistent with the recommendations and testimony" provided by the guardian ad litem at trial. At that time, the guardian ad litem "recommended that no further attempts be made to re-establish the relationship between the plaintiff and [Eric]" because "there is more turmoil and chaos and trouble in [Eric's] life because of the ongoing . . . attempt to have an ongoing relationship [with the plaintiff] . . . than there would be if the relationship were just stopped." (Internal quotation marks omitted.) In essence, that is what the trial court found, albeit only after applying the *Roth* standard from the standpoint of the harm that would befall Eric if the plaintiff were denied visitation and without regard to the harm that would befall Eric if the plaintiff were granted visitation.

Finally, I wish to note that there is nothing in the record to suggest that the defendant's inability to cope with the plaintiff's requested visitation, and the resulting high likelihood that the defendant would experience an extremely negative reaction to such visitation, is in any way a ploy or stratagem devised by the defendant to thwart the plaintiff's efforts to obtain visitation with Eric. It is no doubt, for that reason alone, that this is a very unusual case. In any future case, however, the court is free to reject the bona fides of similar evidence if, in contrast to the present case, it appears that the parent objecting to visitation under *Roth* has threatened to react poorly to an order of visitation primarily for the purpose of defeating visitation.

I therefore conclude, contrary to the decision of the majority, that the judgment of the trial court denying visitation should be affirmed. Accordingly, I respectfully dissent.

EVELEIGH, J., dissenting. I respectfully dissent. I disagree with the majority's conclusion that once the

requirements for visitation established in *Roth* v. *Weston*, 259 Conn. 202, 789 A.2d 431 (2002), have been satisfied, visitation must be granted. I also disagree with the majority's conclusion that "whereas the *Roth* factors establish that there is a relationship that is entitled to be fostered, the best interest of the child [standard] guides the court in determining how best to foster that relationship." In my view, the majority opinion effectively eviscerates the best interest standard set forth in General Statutes § 46b-59,[1] and replaces it with the court mandated *Roth* test. *Roth* was designed as a jurisdictional test to save § 46b-59 from constitutional due process concerns. The majority has morphed *Roth* into a substantive sword determinative of the best interest of a child, instead of the jurisdictional shield against due process concerns for which it was intended. I would conclude that, after finding that the plaintiff, Michael DiGiovanna, had met his burden of proof under *Roth*, the trial court properly applied the best interest of the child standard and properly determined, under the facts of this case, that visitation with the plaintiff would not be in the best interest of the minor child, the son of the defendant, Donna St. George. Accordingly, I would affirm the judgment of the trial court.

[1] General Statutes § 46b-59 provides: "The Superior Court may grant the right of visitation with respect to any minor child or children to any person, upon an application of such person. Such order shall be according to the court's best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable, provided the grant of such visitation rights shall not be contingent upon any order of financial support by the court. In making, modifying or terminating such an order, the court shall be guided by the best interest of the child, giving consideration to the wishes of such child if he is of sufficient age and capable of forming an intelligent opinion. Visitation rights granted in accordance with this section shall not be deemed to have created parental rights in the person or persons to whom such visitation rights are granted. The grant of such visitation rights shall not prevent any court of competent jurisdiction from thereafter acting upon the custody of such child, the parental rights with respect to such child or the adoption of such child and any such court may include in its decree an order terminating such visitation rights."

"The well settled standard of review in domestic relations cases is that this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts. . . . As has often been explained, the foundation for this standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case . . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law."[2] (Citations omitted; internal quotation marks omitted.) *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 366–67, 999 A.2d 721 (2010).

The majority concludes that, in light of the principles enunciated in *Roth*, the trial court's conclusion "not only conflicts with *Roth*, but is improper for other reasons." I disagree. To the contrary, I would conclude that the trial court properly employed the *Roth* test. The trial court properly did not conclude, however, as the majority does, that the *Roth* test superseded the best interest analysis contemplated by § 46b-59.

I begin with the language of the statute. Section 46b-59 provides in relevant part: "The Superior Court may grant the right of visitation with respect to any minor child or children to any person, upon an application of

---

[2] I agree with the majority that we must treat as uncontested the trial court's findings that the plaintiff had satisfied his burden under *Roth*. I also note that although the majority states that "*except as otherwise noted,* this appeal turns on the question of whether the trial court correctly applied the law, an issue over which we exercise plenary review," the majority makes no further reference to the applicable standard of review throughout its opinion. (Emphasis added.)

such person. Such order shall be according to the court's best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable . . . . In making, modifying or terminating such an order, *the court shall be guided by the best interest of the child,* giving consideration to the wishes of such child if he is of sufficient age and capable of forming an intelligent opinion. . . ." (Emphasis added.)

In 2002, this court considered a constitutional challenge to § 46b-59 in *Roth* v. *Weston,* supra, 259 Conn. 202. Specifically, in response to claims that the statute violated due process and the fundamental rights of a parent to rear one's child and to family privacy, this court developed a test to ensure that those rights would be protected. First, in order to establish standing, "any third party . . . seeking visitation must allege and establish a parent-like relationship as a jurisdictional threshold in order both to pass constitutional muster and to be consistent with the legislative intent." Id., 222. This court then continued with what it described as the "second jurisdictional factor in this analysis . . . ." Id. It concluded that in furtherance of this jurisdictional standard, there must be a threshold requirement of a finding of real and substantial harm to the child as a result of the denial of visitation. Id., 226–27. This court further elaborated that the harm alleged "must be a degree of harm analogous to the kind of harm contemplated by [General Statutes] §§ 46b-120 and 46b-129, namely, that the child is neglected, uncared-for or dependent." (Internal quotation marks omitted.) Id., 235. Further, it held that such a finding must be established by clear and convincing evidence. Id., 232.

In *Roth*, this court also recognized that, implicit in § 46b-59, was a rebuttable presumption that visitation that is opposed by a fit parent is not in a child's best interest. Id., 222–23. Further, this court opined that

"[t]he constitutional issue, however, is not whether children should have the benefit of relationships with persons other than their parents or whether a judge considers that a parent is acting capriciously. In light of the compelling interest at stake, the best interests of the child are secondary to the parents' rights." Id., 223. "Because parenting remains a protected fundamental right, the due process clause leaves little room for states to override a parent's decision even when that parent's decision is arbitrary and neither serves nor is motivated by the best interests of the child." Id. Thus, in *Roth*, this court concluded that the trial court had improperly applied the analytical framework set forth in the opinion and improperly granted visitation rights to the plaintiffs, the maternal grandmother and maternal aunt, in violation of the due process rights of the defendant, the father of the minor children, under both the state and federal constitutions. Id., 204, 237–40.

In the present case, the trial court found that the plaintiff had met his burden of proof under *Roth*. The trial court then proceeded to conduct a best interest analysis pursuant to the mandate of § 46b-59. In conducting its best interest analysis, the trial court utilized the fair preponderance of the evidence standard, in accordance with *Fish* v. *Fish*, 285 Conn. 24, 71, 939 A.2d 1040 (2008), which involved a third party custody case. After considering all of the evidence in the present case, the trial court held that it was in the best interest of the child not to have visitation with the plaintiff.

The majority "conclude[s] that the trial court improperly determined that the best interest of the child standard can overcome the *Roth* standard for ordering visitation." Thus, according to the majority, once the second prong of *Roth* is resolved in favor of the plaintiff, the inquiry is over and visitation must be granted to the plaintiff. Herein lies my fundamental disagreement with the majority. The *Roth* test was established by this

court for the purpose of constitutionally saving § 46b-59. It was not intended to replace the statute. It must be interpreted so that it coexists with that statute. "In construing statutory language, [n]o part of a legislative enactment is to be treated as insignificant or unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase . . . and no word in a statute is to be treated as superfluous." (Internal quotation marks omitted.) *Foley* v. *State Elections Enforcement Commission*, 297 Conn. 764, 792, 2 A.3d 823 (2010) (*Gruendel, J.*, concurring); see also *Brown & Brown, Inc.* v. *Blumenthal*, 297 Conn. 710, 726, 1 A.3d 21 (2010) ("[w]e cannot countenance a reading of a statute that would render it superfluous"). I would conclude that the trial court's approach properly interpreted and applied this court's holding in *Roth* in a manner that did not render the language of § 46b-59 superfluous.

To the contrary, the majority's opinion takes a jurisdictional test and transforms it into a substantive rule, thus destroying the best interest of the child test contained in the wording of the statute. Indeed, if the *Roth* test is all that is required to establish third party visitation, § 46b-59 becomes unnecessary. Certainly, the wording of *Roth* did not contemplate such a result. The court in *Roth* held that "[o]nly if that enhanced burden of persuasion has been met may the court enter an order of visitation." *Roth* v. *Weston*, supra, 259 Conn. 235. The use of the word "may" is instructive since it implies that there was still an element of discretion in the trial court after the test was fully satisfied.

The majority readily recognizes the fact that there should be some acknowledgment of a best interest standard: "[W]e do not intend to suggest that the best interest of the child is irrelevant after the applicant meets his or her burden of proof under *Roth*. To the contrary, whereas the *Roth* factors establish that there is a relationship that is entitled to be fostered, the best interest

of the child guides the court in determining how best to foster that relationship." This language again dictates, however, that once the *Roth* factors are proven, the best interest test should only be employed as a tool to help foster the visitation. Indeed, the majority explicitly limits the use of the best interest standard to "counseling, as well as restrictions on the time, place, manner and extent of visitation." I disagree and conclude that the majority's limitation on the best interest standard is contrary to the plain language of § 46b-59. Section 46b-59 provides in relevant part: "In making . . . such an order [of visitation] . . . the court shall be guided by the best interest of the child . . . ." The legislature did not intend, therefore, that the best interest test be a secondary consideration used in fine-tuning the visitation schedule. To the contrary, the plain language of the statute reveals the legislature's intent that the best interest of the child be the primary consideration in determining whether there should be any visitation. Specifically, the legislature used the mandatory phrase: "the court *shall* be guided by the best interest of the child . . . ." (Emphasis added.) General Statutes § 46b-59. The majority opinion has, however, effectively changed the wording of the statute to read that once visitation has been established under *Roth*, "the best interest of the child [standard] guides the court in determining how best to foster that relationship. Those considerations may indicate, as we previously have discussed, counseling, as well as restrictions on the time, place, manner and extent of visitation." Thus, instead of being guided by the child's best interest in order to determine whether there should be any visitation, a court is now required to use the best interest test only as a secondary guideline to determine the nature of that visitation. In my view, this interpretation is contrary to the clear wording of the statute.

Instead, I would conclude that the *Roth* test should remain as it was intended—a jurisdictional test. Once

that jurisdictional test is met, the party seeking visitation is given the opportunity to prove by a fair preponderance of the evidence that visitation is in the best interest of the child. Certainly, by virtue of its finding under *Roth,* a court would necessarily find that there is harm to the child if there is no visitation. That harm must be balanced, however, with the harm the child may experience if there is visitation, among other factors.

This balancing approach is what is missing in the *Roth* analysis because it is a jurisdictional test. Indeed, in *Roth,* this court held that for jurisdictional purposes it was improper for the trial court to have focused its analysis on whether there would be significant harm to the children if visitation were granted. *Roth* v. *Weston,* supra, 259 Conn. 238. Specifically, this court concluded that, for jurisdictional purposes, the analysis should be "whether there would be significant harm to the children were visitation denied." Id. This statement lies at the heart of my objection to today's decision. In a best interest analysis, it would be incumbent upon the trial court to consider, among many other factors, the best interest of the child if there was visitation, and compare that result to the best interest of the child if there was not visitation. Yet, it is this very analysis that is not allowed in the *Roth* jurisdictional test. The majority then transforms a finding made pursuant to the *Roth* standard, without the benefit of the crucial best interest analysis, into a finding on the best interest standard. Indeed, the majority concludes that "the applicant's establishment of the requisite relationship and harm if that relationship is not preserved necessarily exceeds what would have satisfied the best interest of the child standard." Such a result cannot withstand scrutiny. Indeed, the majority's conclusion lies on a foundation of limestone, without the addition of the clay, gypsum, and water needed to help form the concrete.

First, the majority's conclusion ignores the fact that the standard of proof for the best interest test is a fair preponderance of the evidence. Instead, by substituting the *Roth* findings for the best interest standard, it has exchanged a finding based upon clear and convincing evidence for a best interest finding based upon a fair preponderance of the evidence. Such a heavy burden of proof was rejected in *Fish* v. *Fish*, supra, 285 Conn. 71. As this court explained in *Fish*, the legislature explicitly rejected the clear and convincing standard for a best interest analysis in third party custody cases. Id., 67–68. Yet, the majority opinion ignores the wording of both § 46b-59 and General Statutes § 46b-56. The majority also ignores the fact that the legislature has specifically considered the enhanced burden of proof of clear and convincing evidence in these cases, and rejected such a requirement. The majority's intrusion into the legislative fiat in this area is palpable.

It is interesting to note that in *Roth* this court held that "[the] degree of harm requires more than a determination that visitation would be in the child's best interest. It must be a degree of harm analogous to the kind of harm contemplated by §§ 46b-120 and 46b-129, namely, that the child is neglected, uncared-for or dependent." (Internal quotation marks omitted.) *Roth* v. *Weston*, supra, 259 Conn. 235. The standard of proof necessary for establishing neglect is a fair preponderance of the evidence. *In re Juvenile Appeal (84–AB)*, 192 Conn. 254, 268, 471 A.2d 1380 (1984). Nevertheless, this court held in *Roth* that, although the degree of harm must be analogous to the kind of harm contemplated by §§ 46b-120 and 46b-129, the harm must be established by clear and convincing evidence. *Roth* v. *Weston*, supra, 235. Thus, we have a conflict between the requisite proof in *Roth* and the requisite proof in a best interest analysis. I would conclude that in order to make the best interest standard function in § 46b-59, it is necessary that the

two standards be kept separate and distinct. Otherwise, the best interest standard has been reduced to one of the many factors a court could consider in fashioning the visitation order. There is simply no authority in § 46b-59 that justifies such a result.

To the contrary, I would conclude that there are two separate findings that must be made. In effect, a party meeting the *Roth* requirements has established standing. The party must then satisfy the best interest test. The central problem with equating *Roth* factors with best interest findings is that *Roth* excludes most of the factors that a trial judge would ordinarily consider in a best interest analysis. The *Roth* test focuses solely on the harm to the child if there is no visitation. It does not contemplate the numerous factors contained in § 46b-56 (c).

Section 46b-56 (c) provides: "In making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so may consider, but shall not be limited to, one or more of the following factors: (1) The temperament and developmental needs of the child; (2) the capacity and the disposition of the parents to understand and meet the needs of the child; (3) any relevant and material information obtained from the child, including the informed preferences of the child; (4) the wishes of the child's parents as to custody; (5) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (6) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (7) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (8) the ability of each parent to

be actively involved in the life of the child; (9) the child's adjustment to his or her home, school and community environments; (10) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendete lite in order to alleviate stress in the household; (11) the stability of the child's existing or proposed residences, or both; (12) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (13) the child's cultural background; (14) the effect on the child of the actions of an abuser, if any domestic violence has occurred between the parents or between a parent and another individual or the child; (15) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (16) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b. The court is not required to assign any weight to any of the factors that it considers."[3]

As the plain language of the statute explains, in making any visitation order the court shall consider the best interest of the child, and in determining the best interest the court can consider any of these factors. The decision of the majority, however, would exclude most of these factors, except perhaps those sections relating to abuse and neglect, in favor of the *Roth* test. While I agree that

[3] I note that § 46b-56 was the subject of certain amendments since the time of the trial court's order in the present case; see Public Acts 2005, No. 05-258, § 3; including the addition of § 46b-56 (c). Because any reconsideration of the visitation issue on remand will be governed by the current revision, I refer herein to the current revision of § 46b-56 and its subsections.

an examination of these factors is not mandatory, the majority's opinion removes the possibility for a court to consider several factors in determining whether visitation is appropriate, and instead focuses the inquiry solely on whether the child will be harmed in a manner akin to neglect if visitation were denied. What is the aid of the *Roth* test if a court were to find, by clear and convincing evidence, that a child would suffer harm akin to neglect if visitation were denied, but also found, by clear and convincing evidence, that the child would suffer abuse if visitation were granted? Under *Roth*, such a finding by a trial court would be improper because the trial court cannot consider the effect on the child if visitation is granted. Under the majority's opinion a trial court could not consider the effect on the child of the actions of an abuser in a best interest analysis, if the *Roth* elements were proven, because visitation would already be established. Pursuant to the majority opinion, the best interest standard could only be used to fashion the nature of visitation in terms of counseling, time, place and manner of visitation. Even if a trial court were to find that abuse is likely to occur if visitation is granted, visitation must be granted if *Roth* is proven, with restrictions, such as supervised visitation. I strongly disagree that visitation must be granted in such a situation. Indeed, I would conclude that requiring a child to participate in visitation, even in a supervised setting, with an individual who the court finds is likely to abuse the child, would constitute further abuse. Accordingly, I would conclude that a court should be able to consider as many of the best interest factors enumerated in § 46b-56 (c) as it may choose, or any other factors it may deem relevant, and then make a determination as to whether visitation is in the best interest of the child.

Furthermore, the approach adopted by the majority also ignores the wishes of the child. During the best

interest analysis the trial court may consider the wishes of the child, if the child is of sufficient age and capable of forming an intelligent opinion. See General Statutes § 46b-59. This stage is also missing in the *Roth* analysis, and serves as another reason that a finding under *Roth* cannot serve as the basis for the court's final decision regarding visitation. How could a finding under *Roth* be determinative of visitation prior to hearing from a child who was mature enough to voice his or her desires in the matter? The majority may argue that a trial judge could consider the child's wishes in a *Roth* analysis. Although I agree that a court may consider the child's wishes during a *Roth* analysis, a court would be bound to apply the clear and convincing standard of proof to such evidence. See *Roth* v. *Weston*, supra, 259 Conn. 232. Our case law dictates that consideration of a child's wishes must be made using the fair preponderance of the evidence standard.

The majority also concludes that the trial court in the present case improperly applied the law when it made the following statement: "I wish the court had the power to order parents to behave in a way that is not psychologically injurious to their children. However, I cannot control what goes on in the privacy of one's home." Specifically, the majority concludes that this statement suggests that the trial court concluded that it had no authority to compel the defendant to undertake steps that would allow her to comply with the visitation order and that "[s]uch a conclusion would be improper as a matter of law." I would agree with the majority's legal conclusion on this issue, if I agreed with the majority that the trial court's statement reflected a conclusion that it had no authority to compel the defendant to undertake steps that would allow her to comply with the visitation order. Instead, I read the trial court's statement as a general opinion that courts cannot control all forms of human behavior, especially in the pri-

vacy of a person's home. I believe it to be a monumental leap in logic to conclude that this statement has anything to do with the court's view of its power to attach conditions onto any visitation order. The statement is simply too amorphous to attach any legal significance to it. It is also noteworthy that this statement was not challenged by the plaintiff when the court delivered its initial oral decision. Further, the issue was never briefed by the plaintiff. Indeed, the plaintiff raised this claim for the first time at oral argument before this court. There is nothing in the record, other than this vague generality regarding the power of a court to control people in the privacy of their home, for this court to conclude that the trial court did not believe that it had the power to attach conditions to any visitation orders. Accordingly, I would not conclude that the trial court misapplied the law. "It is well established that an appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. . . . [B]ecause our review is limited to matters in the record, we [also] will not address issues not decided by the trial court. . . . The requirement that [a] claim be raised distinctly means that it must be so stated as to bring to the attention of the court the precise matter on which its decision is being asked. . . . The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court . . . to address the claim— would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party." (Citations omitted; internal quotation marks omitted.) *Remillard* v. *Remillard*, 297 Conn. 345, 351–52, 999 A.2d 713 (2010).

Further, the majority also concludes that it was improper for the trial court to not expressly consider § 46b-56 (i)[4] and all of the tools available to it to effectu-

---

[4] General Statutes § 46b-56 (i) provides: "As part of a decision concerning custody or visitation, the court may order either parent or both of the parents

ate visitation. This conclusion is based on the majority's supposition that, having found that the *Roth* standards were proven, visitation was mandated, and that the best interest test could only be used to fashion the exact nature of that visitation. It is more than somewhat ironic to me that the majority finds fault with the trial court's failure to consider § 46b-56 (i) in its consideration of visitation, yet the majority completely ignores § 46b-56 (c) in its determination of visitation. In view of the fact that I disagree with the legal premise that visitation was required once the court determined that the plaintiff satisfied the *Roth* criteria, I further disagree with the conclusion that it was necessary for the trial court to elucidate every conceivable statute it considered and rejected. Indeed, it is equally possible that the trial court believed that there was no need to examine any conditions of visitation pursuant to § 46b-56 (i) because of its conclusion that, in this situation, there should not be any visitation. This is especially likely in light of the conclusion of Kenneth S. Robson, the court-ordered child and adolescent psychiatrist. Robson concluded: "[T]he relationship between [the plaintiff] and [the defendant] cannot and should not be worked on in this evaluator's opinion. There is enough evidence that it is broken and cannot be fixed." Moreover, we will never know whether the trial court considered § 46b-56 (i) because the plaintiff never requested that the trial court articulate the basis for its decision and whether it considered § 46b-56 (i). Indeed, in the absence of an articulation, we need not speculate as to the failure to mention § 46b-56 (i). "In the absence of [an adequate] record [for appellate review], we presume that the trial court, in rendering its judgment . . . undertook the proper analysis of the law and the facts." *S & S Tobacco & Candy Co.* v. *Greater New York Mutual Ins. Co.,* 224

and any child of such parents to participate in counseling and drug or alcohol screening, provided such participation is in the best interests of the child."

Conn. 313, 321–22, 617 A.2d 1388 (1992). Accordingly, I disagree with the majority that the trial court improperly applied the law.

The majority opinion further notes that "[t]he trial court's order, in effect, sanctioned the defendant's infliction of harm akin to abuse or neglect and allowed her to prevail in a case in which she had lost on the merits." This statement further emphasizes the importance that the majority now places on *Roth*. In the majority's view, the defendant had "lost on the merits" when the plaintiff satisfied the *Roth* requirements. In my view, the defendant had not "lost on the merits," since the plaintiff still needed to establish that visitation was in the best interest of the child. Although I agree with the majority that the trial court's decision could be viewed as an imprimatur of the defendant's behavior, I am mindful that the ultimate consideration is the best interest of the child.

Furthermore, in considering this issue, it is important to consider additional undisputed facts. The plaintiff and the defendant never resided together during any part of their relationship. The relationship initially ended in 1993, when the plaintiff called off the wedding that had been planned by the parties. At the end of 1995, the plaintiff and the defendant resumed their relationship. The relationship again ended in 1998. Between 1998 and September, 2002, the plaintiff continued to spend time with the child with the encouragement and consent of the defendant. According to the defendant, between 1998 and 2002, the parties began to have disagreements about the defendant's children that regularly disrupted her family life. She perceived the plaintiff to be undermining her parental authority and denigrating her parenting skills. On September 9, 2002, the plaintiff wrote a letter to the defendant's psychiatrist expressing concern about interactions the plaintiff had observed between the defendant and the child. At this

time, she essentially terminated contact between the plaintiff and the child, except for one hour visits on Halloween and Christmas Eve of that year. After January, 2003, the defendant severed all ties with the plaintiff.

With respect to the plaintiff's request for visitation, I note these additional facts because the defendant's belief that her parenting relationship with her children was being undermined by the plaintiff could have given rise to her vituperation. Eight months after the cessation of visitation, the plaintiff filed the application for visitation at issue in this case. The trial court found that the harm that the child would suffer if there was no visitation did not rise to a level requiring involvement by the department of children and families. The trial court opined that with "the termination of the relationship, the child would suffer harm akin to [neglect]. It doesn't mean that the child is actually neglected, uncared for, or dependent, but the severing of the parent-like relationship would be similar to that type of harm. I did make that finding. However, the overriding obligation of the court is to see [that] the child's best interest is protected." I share the concern of the majority that an approbation of the trial court's decision could send the wrong message to anyone wishing to oppose third party visitation, and could perhaps encourage those who oppose third party visitation to act badly toward their children in the hope of defeating visitation. I would conclude, however, that this case must be confined to its unique facts. It may well be that in other third party visitation cases a court may wish to order counseling or structure a strict visitation schedule in order to facilitate visitation. Such a consideration, however, should be made for the purpose of determining whether there should be any visitation, not merely as a tool used to fashion a visitation order after visitation is a fait accompli on the basis of a *Roth* finding. This

case is certainly unique based upon the prior history of the parties. On the basis of the evidence in the record, I conclude that the trial court properly considered the defendant's actions toward the child after visitation and relied on them in deciding not to grant visitation. Furthermore, there is nothing in the record to suggest that the defendant's actions were an intentional attempt performed in order to defeat the visitation request. To the contrary, the trial court found as follows: "I don't believe [the defendant] has the emotional control or the capacity not to psychologically harm her child if the [trial court] approves that this relationship continue. . . . I don't believe that [the defendant] has a capacity to put [the child's] needs in front of her own. She is currently so angry and so out of control regarding her feelings about [the plaintiff] that I believe those feelings would be taken out against [the child]." On the basis of this finding, it is clear that the trial court found that the defendant's actions were not intentional, but rather an emotional reaction to the conduct of the plaintiff, which the defendant was unable to control. Indeed, it is a bit disconcerting to suggest that parties would intentionally act in a manner detrimental to their children in order to defeat visitation. Given the vagaries of life, however, I do not discount the possibility of such a course of human conduct.

The facts of this case are also unique because of the plaintiff's attempt to interfere with the defendant's counseling. It is hardly surprising that the reduction of visitation, and ultimate termination thereof, coincided with the plaintiff's interference with the defendant's psychiatrist. Further, Robson believed that the relationship between the plaintiff and the defendant "should not be worked on . . . ."

On the basis of the foregoing, I would conclude that the trial court properly considered § 46b-59 in making its order. Indeed, in *Roth*, this court concluded that

"[w]e therefore delineate a scheme consistent with the aforestated principles that will allow [§ 46b-59] to continue to function within the bounds of the constitution." *Roth* v. *Weston*, supra, 259 Conn. 233. The majority's opinion, specifically its conclusion that the best interest test is to be used as an aid to help fashion visitation, rather than as the primary consideration in determining visitation, obfuscates the statute, instead of allowing it to continue to function as intended by the legislature. Instead, I would conclude that the trial court properly applied the balancing test in this case. Accordingly, I would conclude that this court's review should be directed toward the question of whether the trial court abused its discretion.

"As has been repeatedly stated by this court, judicial review of a trial court's exercise of its broad discretion in domestic relations cases is limited to the questions of whether the [trial] court correctly applied the law and could reasonably have concluded as it did. . . . Our function in reviewing such discretionary decisions is to determine whether the decision of the trial court was clearly erroneous in view of the evidence and pleadings in the whole record. . . . [W]e allow every reasonable presumption in favor of the correctness of [the trial court's] action." (Citations omitted; internal quotation marks omitted.) *Unkelbach* v. *McNary*, 244 Conn. 350, 366, 710 A.2d 717 (1998). "Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." (Internal quotation marks omitted.) *Misthopoulos* v. *Misthopoulos*, supra, 297 Conn. 372. In this case, the record is abundantly clear that the trial court had more than a sufficient basis to justify its decision. We must also review the trial court's ruling with a view toward the statutorily mandated best interest of the child. We are looking to what is in the

child's best interest. The issue of visitation is not a punishment to the defendant for some perceived bad behavior, or a reward to the plaintiff for perceived good behavior.

The record is replete with sufficient evidence to support the trial court's decision that visitation would not be in the best interest of the child. For instance, the child's sister[5] testified that there was a lot less tension in the household since the child stopped seeing the plaintiff, and that the child seemed like he was doing a lot better and he was not having behavior problems. Robson testified that "[t]he disruptions that would occur with a constant state of turmoil were [the plaintiff] and the child to resume contact would seem to me more harmful than the peace that has been described . . . ." Robson also opined that the defendant is "a competent mother" who is "not unfit." Anne M. Phillips, a court-appointed psychologist, testified that "there is likely significant peril to [the child] in terms of the cost to his relationship with [the defendant] for him to have contact with [the plaintiff]." Attorney Gerard Adelman, the guardian ad litem for the child, also agreed with the trial court's conclusion that visitation was not in the best interest of the child. Thus, there is sufficient evidence in the record to support the court's decision.

"[A]lthough the trial court may rely on expert testimony, it ultimately must make its own independent determination as to the best interest of the child." *In re Davonta V.*, 285 Conn. 483, 489, 940 A.2d 733 (2008); see *In re Jeisean M.*, 270 Conn. 382, 398, 852 A.2d 643 (2004). In undertaking appellate review, this court "must defer to both the trial court's weighing of the expert testimony presented and the trial court's inde-

---

[5] I note that although the plaintiff also had sought visitation with the child's sister in his application for visitation, she had reached the age of eighteen while the application was pending and, accordingly, the plaintiff withdrew his request for visitation with her.

pendent factual determination as to what was in [the child's] best interest." *In re Davonta V.*, supra, 489. "An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) *State* v. *Garcia*, 299 Conn. 39, 52–53, 7 A.3d 355 (2010). In the present case, the trial court had the benefit of viewing the witnesses and evaluating their credibility, and the record is replete with evidence to support its finding that visitation was not in the best interest of the child.

The majority opinion indicates that once the *Roth* test is satisfied based on a showing of clear and convincing evidence that the effect of a denial of visitation will be akin to neglect or abuse of the child, it is therefore impossible to hold otherwise, based upon a best interest, fair preponderance of the evidence standard. In my view, if indeed that is the case, *Roth* has now become the paragon for bench legislation. My response to this proposition is twofold: First, in order to make sense of § 46b-59, it is necessary to overrule *Roth* regarding the use of clear and convincing evidence as the necessary standard of proof. I would propose the standard of a fair preponderance of the evidence in order to allow *Roth* to coexist both with the visitation statute and our existing case law. Why does *Roth* require the clear and convincing standard of proof for visitation when that is the same high standard that is required for cases involving the termination of parental rights? See *Santosky* v. *Kramer*, 455 U.S. 745, 769–70, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (clear and convincing standard of proof applicable to termination of parental rights). It presents a challenge to find the logic in this requirement. It is necessary that we overrule the standard of

proof aspect of *Roth* in order to foster a consistent body of law. The *Roth* standard of proof does not fit with the best interest standard of § 46b-59, in which proof is measured by a fair preponderance of the evidence. If we established a fair preponderance standard in the *Roth* test, as I believe we should, it would complete the mantra enunciated in *Roth* to the effect that § 46b-59 should "continue to function with the bounds of the constitution." *Roth* v. *Weston*, supra, 259 Conn. 233. This sentiment is especially true since in *Roth* this court held that, "in the visitation context, the heightened standard of clear and convincing evidence *is not constitutionally mandated*." (Emphasis added.) Id., 231. I conclude that it is neither logically sound nor judicially prudent to allow a court mandated standard to override most of the best interest considerations set forth in § 46b-56 (c). Second, if we do not overrule *Roth* in this regard, we have two conflicting standards of proof. In order to recognize the effect of the statute, it is, therefore, necessary that we recognize *Roth* for what it is—a jurisdictional test that does not consider all of the elements necessary in a true best interest analysis.

I would conclude that there is ample evidence in the record to support the trial court's decision. In light of the existing law, in the absence of our overruling the *Roth* standard of proof, the trial court properly considered the elements of both the *Roth* test and § 46b-59. I would, therefore, defer to the trial court's independent determination as to the best interest of the child. Furthermore, I would conclude that the trial court followed both *Roth* and the statutory mandates of § 46b-59 in arriving at its independent determination as to the best interest of the child. Keeping in mind that a court must be careful not to trespass upon the province of the legislature in its efforts to save a statute from constitutional infirmities, I would conclude that the majority's opinion, regarding the proper role of the best interest

standard in third party visitation cases, is contrary to the clear language of the visitation statute. Accordingly, I would affirm the judgment of the trial court.