RANDY A. J., Petitioner-Respondent,

v.

NORMA I. J., Respondent-Co-Appellant,

BRENDAN B., Intervening-Respondent-Appellant.†

Court of Appeals

*No. 02–0469. Submitted on briefs September 26, 2002.—Decided November 13, 2002.*

2002 WI App 307

(Also reported in 655 N.W.2d 195.)

† Petition to review granted 3-13-03.

On behalf of the intervening-respondent-appellant, the cause was submitted on the briefs of *Jennifer Weber* of *Zick & Weber Law Offices, LLP*, of Johnson Creek.

On behalf of the respondent-co-appellant, the cause was submitted on the briefs of *Robert J. Welcenbach* of *Welcenbach & Widmann* of Milwaukee.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Virginia M. Stuller* of *Carr, Kulkoski & Stuller, S.C.*, of New Berlin.

Before Brown, Anderson and Snyder, JJ.

¶ 1. BROWN, J. This divorce case presents an unusual factual scenario. Randy A. J. is willing to continue supporting and providing care for a child that is not biologically his own. He seeks to maintain the parent-child relationship he established with a child born during his marriage to the natural mother, Norma I. J., despite the fact that genetic tests have established to a 99.99% degree of certainty that Brendan B. is the child's father. Norma and Brendan argue that because the genetic tests showed that Brendan is the biological father of the child, the trial court had no authority to determine that establishing Randy as the legal father and awarding him custody were in the best interests of the child. We conclude that Randy is the equitable parent of the minor child and affirm the trial court's decision that otherwise awarded Randy custody of the child.

¶ 2. The following facts are relevant to this appeal. In 1997, during her marriage to Randy, Norma began a relationship with Brendan, a resident of Illi-

124

nois. In January 1998, while she was still married to Randy, Norma gave birth to a child. In May 1999, Norma was sentenced to eight years in prison. For the fifteen months prior to Norma's incarceration, Norma and the child would visit Brendan on a weekly basis. Since Norma's incarceration, the child has resided with Randy. In August 1999, Brendan commenced a paternity action regarding the child in Illinois; the action was later dismissed for lack of subject matter jurisdiction.

¶ 3. In September and October 1999, Randy filed a petition for divorce and obtained a temporary order prohibiting Brendan from having any contact with the child. Brendan was served with notice of the temporary order hearing, but did not appear. In December, Norma filed a counterclaim in the divorce action alleging that Brendan was the biological father of the child.

¶ 4. In August 2000, Randy filed a motion to dismiss Norma's counterclaim with respect to the paternity of the child, seeking to preclude blood tests from being taken before a best interests hearing took place. Shortly thereafter, however, Randy inexplicably withdrew his opposition to the genetic testing. Norma, Brendan and the child submitted to genetic testing and the test results established to a 99.99% degree of certainty that Brendan was the biological father of the child.

¶ 5. In February 2001, Brendan filed a motion to intervene in the divorce action. Brendan sought to be adjudicated the natural father and requested legal custody and primary physical placement of the child. The parties stipulated to his intervention. The court held four days of hearings concerning whether it was in the best interests of the child for Brendan to be named the father. Following the hearings, Randy filed a motion to dismiss Brendan's motion to intervene.

¶ 6. The trial court concluded that while Norma was equitably estopped from raising the issue of the child's paternity, estoppel did not bar Brendan from raising the issue of the child's paternity. The court then determined that although genetic tests showed Brendan to be the child's biological father, it had the ability pursuant to WIS. STAT. §§ 767.463 and 767.458(1m) (1999–2000),[1] the statutes governing the trial court's authority to dismiss paternity actions before a genetic test is taken, to hold a hearing to determine whether it was in the best interests of the child for the court to establish Brendan as the father.

¶ 7. Based upon the four days of testimony, the court concluded that it was not in the best interests of the child for Brendan to be named the father. The court then dismissed Brendan's motion to intervene and Norma's counterclaim as it related to the paternity adjudication and declared that Randy was the legal father and awarded him custody. Brendan and Norma appeal this decision.

■■■■

¶ 8. On appeal, Brendan and Norma assert that once the parties submitted to genetic testing and the tests showed Brendan to be the biological father, the trial court erred in concluding that WIS. STAT. §§ 767.463 and 767.458(1m) granted it the authority to conduct a best interests of the child hearing and dismiss the paternity actions. Brendan and Norma further contend that once the genetic tests demonstrated that Brendan was the biological father of the minor child born during Randy and Norma's marriage, he overcame the marital presumption contained in WIS. STAT.

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

§ 891.41. These two issues present questions of statutory interpretation. The proper construction of statutes is a question of law that we review de novo. *Truttschel v. Martin*, 208 Wis. 2d 361, 364–65, 560 N.W.2d 315 (Ct. App. 1997). If the terms of a statute are clear and unambiguous, we apply them as written, without any further inquiry into their meaning. *State v. Charles R.P.*, 223 Wis. 2d 768, 771–72, 590 N.W.2d 21 (Ct. App. 1998).

■

¶ 9. The language of both WIS. STAT. §§ 767.463 and 767.458(1m) is plain and unambiguous. Section 767.458(1m) provides:

> In an action to establish the paternity of a child who was born to a woman while she was married, where a man other than the woman's husband alleges that he, not the husband, is the child's father, a party may allege that a judicial determination that a man other than the husband is the father is not in the best interest of the child. If the court or court commissioner under s. 757.69(3)(g) determines that a judicial determination of whether a man other than the husband is the father is not in the best interest of the child, no genetic tests may be ordered and the action shall be dismissed.

The statute is specific. It is clearly intended to grant the court the authority to *prevent* the parties from taking genetic tests where a child would be harmed by a determination that someone other than the husband is his or her father. If the court determines that it is not in the marital child's best interests to have a judicial determination of paternity, genetic tests may not be performed under court order and the court is authorized to dismiss the paternity action. But once the

parties have submitted to genetic tests, § 767.458(1m) is inapplicable and the trial court cannot dismiss the action on these grounds.

¶ 10. Similarly, WIS. STAT. § 767.463 is relevant in a paternity action only if the parties have not submitted to genetic tests. Section 767.463 reads as follows:

> Except as provided in s. 767.458(1m), at any time in an action to establish the paternity of a child, upon the motion of a party or guardian ad litem, the court or court commissioner under s. 757.69(3)(g) may, with respect to a man, refuse to order genetic tests, *if genetic tests have not yet been taken,* and dismiss the action if the court or court commissioner determines that a judicial determination of whether the man is the father of the child is not in the best interest of the child. (Emphasis added.)

The statute explicitly permits the court to dismiss an action to establish the paternity of a child based upon the best interests of the child only if genetic tests have not yet been taken. The trial court concluded that it could remove the phrase, "if genetic tests have not yet been taken," without altering the reading of the balance of the statute. Ordinarily, the court must construe a statute so that no part of it is rendered surplusage and if possible give every word effect. *Donaldson v. State*, 93 Wis. 2d 306, 315, 286 N.W.2d 817 (1980). Our conclusion that the court has the authority to dismiss the action on best interests of the child grounds only if genetic tests have not yet been taken is the single construction that gives effect to all of the words in the statute. We therefore hold that a court may dismiss an action to

establish the paternity of a child pursuant to § 767.463 only if the court has not yet ordered the parties to submit to genetic testing.

¶ 11. Here, Randy stipulated to genetic testing. Norma, Brendan and the minor child submitted to the genetic tests, which established to a 99.99% degree of certainty that Brendan was the minor child's father. Because the court ordered the genetic tests upon the request of the parties and the parties submitted to the testing, Wis. Stat. §§ 767.458(1m) and 767.463 do not apply to this case and the trial court erred when it concluded that it had the authority to dismiss Brendan's motion to intervene based upon a best interests of the child determination pursuant to § 767.463.

¶ 12. The trial court next concluded that despite the fact that the genetic tests had established Brendan's parentage to a 99.99% degree of certainty, Brendan had not rebutted the marital presumption contained in Wis. Stat. § 891.41(1). Section 891.41(1)(a) provides that a man is presumed to be the natural father of a child if he and the child's natural mother have been married to each other and the child is born during the marriage. This presumption of paternity is rebuttable. *J.F. v. R.B. & T.B.*, 154 Wis. 2d 637, 640, 454 N.W.2d 561 (Ct. App. 1990). The presumption is rebutted by the results of a genetic test establishing by a statistical probability of 99.0% or higher the parentage of a man other than the man presumed to be the father under subsec. (1). Sec. 891.41(2). If genetic tests show that the alleged father is not excluded and the statistical probability of the al-

leged father's parentage is 99.0% or higher, the alleged father is rebuttably presumed to be the child's parent. WIS. STAT. § 767.48(1m).

¶ 13. Norma gave birth to the child while married to Randy and thus by statute Randy was the child's presumptive father. However, once the genetic tests demonstrated that Brendan was the father to a 99.99% degree of certainty, Brendan had rebutted this marital presumption according to the plain language of the statute and is rebuttably presumed to be the child's father according to WIS. STAT. § 767.48(1m). We, therefore, conclude the trial court erred when it determined that Brendan had not rebutted the presumption of paternity set forth in WIS. STAT. § 891.41(1) with the genetic tests establishing his parentage to the requisite degree of certainty.

¶ 14. Brendan and Norma next seem to argue that because WIS. STAT. § 891.41(2) establishes that he is rebuttably presumed to be the father, we should reverse the decision of the trial court declaring Randy the legal father of the child and granting him custody. Norma also argues that the trial court erred when it estopped her from asserting the child's parentage.

¶ 15. While the trial court may have used the incorrect vehicle in the law, the court clearly felt compelled by the evidence to declare that Randy, not Brendan, should be the child's father. The trial court made unmistakable, but implicit, findings that Brendan should not be entitled to whatever foothold he had gained by reason of the genetic tests. In *B.L.J. v. Polk County DSS*, 163 Wis. 2d 90, 109, 103–05, 470 N.W.2d 914 (1991), our supreme court was faced with a similar

130

situation where the trial court was wrong on the law, but its factual findings supported the correct result, had the proper legal standard been applied. With *B.L.J.* as our authority, we do the same here. We will hereafter establish the correct law and, after having so established it, will explain why the trial court's findings support an affirmance under the proper legal standard.[2]

¶ 16. We first reiterate what we have already written—that the marital father is presumed to be the natural father unless rebutted. A genetic test showing another man to be the natural father rebuts that presumption. But that does not end the matter. Under Wis. Stat. § 767.48(1m), the natural father then only gains a *rebuttable presumption* that he is the child's parent. Thus, it is evident from the law that even if a test shows a man to be the natural father, his legal fatherhood is only presumed. Next, we must consider "how" such a presumption may be overcome. In our view, the presumption may be overcome by evidence that the marital father has so bonded with the child as to be considered the "equitable parent." Therefore, we see the real issue in this case to be whether the evidence supports affirmance on grounds that Randy is the equitable parent, thus overcoming Brendan's rebuttable presumption that he, as the natural parent, is the legal parent. We begin our analysis with a discussion of what the "equitable parent" doctrine is and where it came from.

---

[2] Although the trial court did not explicitly consider the correct law, we may affirm an order supported by the record even though the trial court may have reached the same result for different reasons. *See State v. Gaines*, 197 Wis. 2d 102, 109 n.5, 539 N.W.2d 723 (Ct. App. 1995).

¶ 17. Wisconsin has recognized the equitable parent doctrine. *See J.J. v. R.J.*, 162 Wis. 2d 420, 426–30, 469 N.W.2d 877 (Ct. App. 1991). The equitable parent doctrine extends the rights and responsibilities of a natural parent to a nonbiological parent seeking custody or visitation. *See id.*; *see also Atkinson v. Atkinson*, 408 N.W.2d 516, 519 (Mich. Ct. App. 1987). Once a court determines that a party is an equitable parent, there is no distinction between the equitable parent and any other parent; each is endowed with the same rights and responsibilities of parenthood. *York v. Morofsky*, 571 N.W.2d 524, 526 (Mich. Ct. App. 1997). We have permitted a mother in a divorce action to estop a nonbiological father from denying paternity in order to avoid child support obligations. *See A.M.N. v. A.J.N.*, 141 Wis. 2d 99, 105–06, 414 N.W.2d 68 (Ct. App. 1987). We have also held that for the purposes of establishing a right to a relationship with the child born to his wife but fathered by another man, the husband may utilize the status of "equitable parent" to assert an equitable estoppel defense against the child's mother instituting paternity proceedings against him. *J.J.*, 162 Wis. 2d at 429–30. Here, we face the unusual situation where the mother is in prison, the child does not recognize the biological father as being her parent, and the nonbiological father not only wants to continue the parent-child relationship, but also wishes to support the child emotionally and financially by maintaining custody of the child.

¶ 18. The Michigan Court of Appeals faced a somewhat similar situation in *Atkinson*. In *Atkinson*, the child was conceived and born during the marriage of the parties in the divorce action and the father and child had maintained a close and affectionate father-child relationship. *Atkinson*, 408 N.W.2d at 520. Blood

132

tests, however, excluded the husband as the child's biological father. *Id.* at 517. The father desired to have the relationship continue and to have the rights and responsibilities accorded to fatherhood. *Id.* at 519. The mother acknowledged that the husband related to the child as a father and that she had waited until answering a question in interrogatories before asserting that the husband was not the biological father. *Id.* at 520.

¶ 19. Based upon these facts, the court concluded that the husband was entitled to be treated as a natural father under the equitable parent doctrine. *Id.* Thus, the custody dispute between the husband and the wife would be settled as if it were between two natural parents, based upon the child's best interests. The court observed that it was established that a man who is not the biological father of a child could be considered a parent against his will and consequently burdened with the responsibility for child support, and that in such a case the man may also receive the right of custody or visitation. *Id.* at 519–20. The court concluded that it was a logical extension of this view to recognize that under certain circumstances a person who is not the biological father of a child may be considered a parent when he desires such recognition and is willing to support the child in addition to wanting the reciprocal rights of custody or visitation afforded to a parent. *Id.* at 520. The court held the equitable parent doctrine would permit a husband who is not the biological father of a child born during a marriage to be considered the natural parent of the child where: (1) the husband and the child mutually acknowledge a relationship as father and child, or the mother of the child has cooperated in the development of such a relationship over a period of time prior to the filing of the complaint for divorce; (2)

the husband desires to have the rights afforded to a parent; and (3) the husband is willing to take on the responsibility of paying child support. *Id.* at 519.

¶ 20. While we acknowledge that the equitable parent doctrine has not been invoked in Wisconsin against a natural parent for the purpose of awarding custody to a nonparent, we have invoked the doctrine set forth in *Atkinson* against a natural parent for the purpose of awarding visitation to a nonparent in a situation that bears some factual similarity to this case. *See J.J.*, 162 Wis. 2d at 428–30. In *J.J.*, a child was born while the parties to a divorce proceeding were married. *Id.* at 428. The husband and the child had developed a close parent-child relationship. *Id.* The mother waited until after the husband filed a motion for custody of the child to move the family court commissioner to order the husband to submit to blood tests. *Id.* at 423, 429. The blood tests excluded the husband as the father and the family court commissioner terminated visitation between the husband and the minor child. *Id.* at 423–24. We held that the husband had the status of "equitable parent," and that the mother was equitably estopped from seeking a declaration that the husband was not the child's natural parent for the purposes of the proceedings. *Id.* at 429–30. We recognized, however, that the "child's interest is separate and distinct from the interest of the mother and husband," and thus upon further inquiry and the recommendation of the guardian ad litem, subsequently determined that granting the husband equitable parent status was in the best interests of the child. *Id.*

¶ 21. In *Atkinson* and *J.J.* the courts used the equitable parent doctrine to support a nonbiological father in his efforts to maintain a parent-child relation-

ship when that was in the child's best interests. In this case, the trial court held several days of hearings concerning the best interests of the child in which all of the parties participated. Again, we acknowledge that in exercising its equitable powers, the trial court did not expressly use the equitable parent doctrine to declare Randy the legal father and otherwise award him custody. However, during the hearings, the trial court made substantial and careful findings of fact regarding the relationship each party had established with the child and the conduct of the parties concerning the child's paternity and we use these findings in our analysis of the equitable parent doctrine as applied to this case. Whether the facts as found permit the application of equitable estoppel is a question of law that we review independently of the trial court's determination. *J.J.*, 162 Wis. 2d at 429.

¶ 22. During the pregnancy and up until Norma's incarceration, Randy, Norma and the child lived together. After Norma's incarceration, Randy became the sole custodian of the minor child and has continued to assume responsibility for her. The child considers Randy to be her only father and, up until the divorce proceedings, Randy believed her to be his biological daughter. The trial court found that "there clearly is a—what would otherwise be viewed as a normal parent-child relationship and bond between [Randy] and [the child], and, in fact, he has been her only parent from the standpoint of regular and daily contact and custodial care since May of 1999." The trial court also determined that Randy had taken significant responsibility for raising the child and had requested that he be able to continue to assume that responsibility and maintain the relationship he established with the child.

¶ 23. Prior to the divorce proceeding, and with Norma's cooperation, Randy believed he held the status of a natural parent and assumed the rights and responsibilities of fatherhood. Norma and Brendan never took any steps to change Randy's belief despite the fact that they had suspected Brendan was the father of the child. The trial court found it was in both Norma's and Brendan's best interests not to take any action concerning the child's paternity. Norma was involved in significant criminal legal difficulties at the time and needed Randy's financial backing. During legal proceedings, Randy supported Norma and funded the costs of her legal representation, using all of the family's cash and equity in their home. It was not until Norma was incarcerated and Randy filed for divorce that Norma raised the paternity issue.

¶ 24. The trial court also found that Brendan had the opportunity and ability to assume parental responsibility for the child and chose not to do so. The court determined that while Brendan saw the child on a weekly basis prior to Norma's incarceration, the relationship established between the two was not that of father and daughter. The relationship arose simply upon the event of Norma's relationship with Brendan. The trial court further determined that Brendan, having to purchase such things as diapers, formula, and some clothing for the child during her extended weekend stays prior to Norma's incarceration, in no way constituted support of the child either emotionally or financially. Finally, the court noted that Brendan did not raise the issue of his paternity in this state until the child was well over three years old. We further observe that although by virtue of the temporary order Brendan was later prohibited from establishing contact with the child, he could have offered to pay for medical expenses

136

or otherwise established a financial relationship with the child, but once again chose not to do so.

¶ 25. The trial court also relied upon the testimony and recommendations of the psychologist, Dr. Cathy J. Crandall, who evaluated the child, Randy, Norma and Brendan. Dr. Crandall determined that the child related to Randy as her father and it would be harmful to the child to remove her from Randy's care. She recommended that Randy remain the father of the child. We note that Dr. Crandall further recommended that Randy and Norma have joint custody of the child, but that she continue to be primarily placed with Randy at least until Norma is released from prison. Finally, the court also gave due consideration to the substance abuse problems of the parties.

¶ 26. Prior to the divorce proceedings, Randy believed he was the child's natural parent. Indeed, he is the only father the child has ever known. Randy has established that he is willing to continue assuming responsibility for support obligations and further desires the rights accorded to parenthood. Brendan and Norma chose not to take any action regarding Brendan's paternity until long after they suspected he was the father of the child, and as a result, Randy formed a bond with the child and Brendan has no relationship with the child. We therefore conclude that Randy is the child's equitable father.

■■■

¶ 27. We have just determined that Brendan may not assert his parentage based on the facts as found by the trial court and the applicable law. The question remaining is whether Norma still may assert the child's parentage. The trial court equitably estopped Norma from raising the issue of the child's paternity. As the trial court noted, and as we have just stated, Norma

chose not to take any action regarding Brendan's paternity until well after she and Brendan suspected that Randy was not the father of the child. Norma's actions allowed Randy and the child to form a close bond. We affirm the trial court's determination that it was in the child's best interests that the court estop Norma from asserting the child's parentage. We hold that Randy is the legal father and affirm the trial court in that regard. We also hold that Randy is entitled to custody and affirm the trial court's determination on that issue.

*By the Court.*—Order affirmed.