*Kpetigo v. Kpetigo*, No. 2122, September Term, 2017. Opinion by Nazarian, J.

**FAMILY LAW – DE FACTO PARENTHOOD**

When a putative *de facto* parent's relationship with a child has been encouraged and facilitated by a biological parent, and that *de facto* parent has met all of the factors identified in *Conover v. Conover*, 450 Md. 51 (2016), then the trial court may grant visitation or custody of the child to the *de facto* parent if the court finds that it would be in the child's best interest.

**FAMILY LAW – DE FACTO PARENTHOOD – GENDER**

*Conover*'s holding recognizing *de facto* parent status in Maryland is not limited to same-sex couples, but applies to any person who can satisfy the *de facto* parent standard.

Circuit Court for Montgomery County
Case No. 0000139854FL

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2122

September Term, 2017

_____

HALE KPETIGO

v.

REBECCA MACVITTIE KPETIGO

_____

Nazarian,
Friedman,
Fader,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: August 30, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

> Parenthood is not an object of appetite or even desire. It is an object of will. There is no appetite for parenthood; there is only a purpose or intention of parenthood.[1]

As society evolves in its recognition of relationships and families not formed purely by biology, so too must the law. Hale Kpetigo ("Father") asks us to reverse the judgment of the Circuit Court for Montgomery County finding his ex-wife, Rebecca MacVittie Kpetigo ("Parent"), a *de facto* parent—a status not recognized by the Court of Appeals until *Conover v. Conover*, 450 Md. 51 (2016)—of F, his son from a prior relationship, and granting her visitation with him. Father also asks us to decrease the child support the court ordered him to pay Parent for the care of their son, L, and to revoke the tie-breaking authority to Parent as part of their joint legal custody of L. We reject Father's argument that *Conover* recognized *de facto* parenthood only for same-sex married couples, and we affirm the judgment except as to the child support order. We remand for the limited purpose of re-calculating child support using Parent's up-to-date income or for the circuit court to explain its rationale for using the older figure.

## I.     BACKGROUND

While they were married, Parent and Father parented two young boys. L is their biological child and was born during the marriage. F is Father's son from a previous relationship. F was born in France and his mother was a resident of the Ivory Coast; she was named as a party in this action, but never appeared and has not participated.

---

[1] R.G. COLLINGWOOD, THE NEW LEVIATHAN, pt. 2, ch. 23, aph.85 (1942).

From the time he was approximately four months old, F visited Father in the United States. At that point, Father was not yet a U.S. citizen, but he lived here during the time he dated, and then married, Parent. Whenever F visited, both Father and Parent cared for him. They married in 2009, when F was approximately three years old; F lived practically full time with them by that point. Father and F both obtained U.S. citizenship through Parent.

After their marriage, Parent expressed interest in adopting F, but Father was reluctant to risk disrupting the relationship between F and his mother. Even so, as the circuit court observed in its memorandum opinion and order, Parent "cared for [F] as if he were her own child" and was involved in all aspects of his life:

> [Parent] picked him up and dropped him off at school, play dates, doctor appointments, and extracurricular activities . . . . [She] packed his lunches, went to parent-teacher conferences, and coordinated his education, daycare, and babysitters. . . . [S]he took time off and altered her work and school schedule to be with [F] as needed. With the help of her extended family, [Parent] financially supported [F]. As a result, [F] has significant relationships with many members of [Parent]'s family. [F] regularly vacationed in Cape Cod with [Parent]'s parents and established close relationships with [Parent]'s siblings, whom he calls Auntie and Uncle, and their children whom he considers his cousins.

L was born in 2013. According to testimony at trial, L and F had a close relationship, and the couple made no distinctions about who was whose biological child.

In 2014, F was abducted by his mother during a trip to visit her in Africa. Both Parent and Father worked tirelessly to regain custody—both made calls to the FBI, Congressmen, local and foreign embassies, and both made personal visits to the mother's house in Africa. F was returned after sixty-two days, and Father gained full physical and

legal custody; a warrant was issued for the mother's arrest. F's mother visited once in late 2015, but she has not been in the United States to see him since the warrant was issued. She does call and video chat with him.

Parent and Father separated in December 2015. Until then, F had resided full-time with Father and Parent. Although both F and L lived with Parent at first, F eventually moved to live with Father. Even after they separated, Parent continued to visit F until Father restricted her access to him. All told, F lived full-time with both for at least six-and-a-half years by the time he turned 11.

Upon separating, Father and Parent agreed to share custody of L using a 2/2/5/5 custody schedule.[2] Additionally, Father agreed to allow F to have visitation with Parent. At first, Parent had free access to F and saw him almost every day, but shortly thereafter Father restricted her access. Nevertheless, Parent purchased a home near Father's to minimize disruptions to the boys' lives.

In March 2016, Parent and Father entered into a Voluntary Separation and Marital Settlement Agreement (the "Agreement") that formalized the arrangements they had been following. The Agreement confirmed that they shared joint legal and physical custody of L. Father agreed to pay Parent $300 per month for L's care. But the Agreement did not address F, or Parent's right to visitation with F, because, according to Parent, Father "was holding the separation agreement over [her] head basically saying that [she] c[ould] see [F]

---

[2] In this case, a "2/2/5/5" schedule meant L spent Mondays and Tuesdays with Parent, Wednesdays and Thursdays with Father, and alternate weekends between Parent and Father.

once [they] figure out the written stuff . . . ." Parent testified that Father "indicated that he wouldn't negotiate [F] until [they] had signed the settlement agreement."

On October, 13, 2016, Parent filed for a limited divorce. She amended her complaint (the "Complaint") to seek an absolute divorce, enforcement of the Agreement, child support, tie-breaking authority for matters pertaining to L, and visitation with F. Trial was held in October 2017, and on December 7, 2017, the trial court issued an order granting Parent $1,057 per month of child support for the care of L and joint legal custody of L, with tie-breaking authority for Parent. The court also found that Parent qualified as F's *de facto* parent under the factors set forth in *Conover v. Conover*, 450 Md. 51, 74 (2016), that it was in F's best interests to maintain his relationship with Parent, and that Parent was entitled to visitation with F. Father filed a timely appeal. We include additional facts below as necessary.

## II.  DISCUSSION

### A.  The Circuit Court Correctly Applied The Standard For *De Facto* Parenthood.

*First*, Father challenges the circuit court's decision finding Parent a *de facto* parent of F and, after finding as well that continuing F's relationship with Parent was in F's best interests, ordering visitation. He quarrels less with the visitation order itself—he consented to visitation both before trial and during his trial testimony—than with the court's analytical path. He argues that the court erred in analyzing Parent's request for visitation using the *de facto* parenthood standard articulated in *Conover* rather than treating Parent as a third party, which would have required the court to find him unfit or that exceptional

4

circumstances applied. *Conover*, he says, is limited to same-sex married couples, and he's right that *Conover* itself involved a same-sex divorce. But nothing in the principles underlying the *Conover* decision or *de facto* parenthood writ large limits *de facto* parenthood to the same-sex context. The circuit court applied the right standard and applied it correctly.

We review visitation and custody orders for abuse of discretion. *Walter v. Gunter*, 367 Md. 386, 391–92 (2002). "There is an abuse of discretion where no reasonable person would take the view adopted by the [trial] court, or when the court acts without reference to any guiding rules or principles." *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312 (1997) (cleaned up). If, however, the order involves an interpretation and application of statutory or case law, we review the trial court's conclusions *de novo*, *Walter*, 367 Md. at 391–92, and Father's challenge here falls into this latter category.

Generally, step-parents who have neither adopted a child nor been declared his guardian have no parental rights or obligations that survive divorce. *Bledsoe v. Bledsoe*, 294 Md. 183 (1982) (duty of child support does not extend to step-parent); *see also Brown v. Brown*, 287 Md. 273 (1980); *Rand v. Rand*, 280 Md. 508 (1977);  *Blades v. Szatai*, 151 Md. 644 (1927); *Alvey v. Hartwig*,  106 Md. 254 (1907); *Greenwood v. Greenwood*, 28 Md. 369 (1868); *see also* 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 447 (Christian ed., Phila. 1854) ("[T]he duty of parents to provide for the maintenance of their children, is a principle of natural law; an obligation laid on them not only by nature herself, but by their own proper act, in bringing them into the world: . . . By begetting them, therefore, they have entered into a voluntary obligation to endeavor, as far as in them lies,

5

that the life which they have bestowed shall be supported and preserved."). Instead, step-parents previously have stood in the same shoes as other non-parental third parties.

Before it could order custody or visitation to a step-parent, a court historically had to find first that the child's biological or adoptive parents were unfit or that exceptional circumstances existed, and then that custody or visitation serves the best interests of the child. *See Ross v. Hoffman*, 280 Md. 172, 178–79 (1977) ("When the dispute is between a biological parent and a third party, it is presumed that the child's best interest is subserved by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as make such custody detrimental to the best interest of the child."); *see also Koshko v. Haining*, 398 Md. 404, 419 (2007). In recent years, however, courts across the country have recognized as *de facto* parents a narrow class of third parties who have a special relationship with a child. Stated generally, a *de facto* parent is a non-related adult "who claims custody or visitation rights based upon the party's relationship, in fact, with a non-biological, non-adopted child."[3] *Janice M. v. Margaret K.*, 404 Md. 661, 680–81 (2008), *overruled by Conover*, 450 Md. at 66.

Maryland has moved carefully toward recognizing *de facto* parenthood. Our Court did so initially in *S.F. v. M.D.*, 132 Md. App. 99, 111–12 (2000), *overruled by Janice M.*,

---

[3] Other jurisdictions have also referred to this status as a "psychological parent," an "equitable parent," a "de facto custodian," or being *in loco parentis*. In *McDermott*, the Court of Appeals defined "psychological parents" as "third parties who have, in effect, become parents." 385 Md. at 356. Or essentially, like *de facto* parents, "persons who have assumed a parental role." *Conover*, 450 Md. at 67–68.

404 Md. at 685, and adopted a four-part test articulated by the Wisconsin Supreme Court in *In re Custody of H.S.H.-K*, 193 Wis.2d 649 (1995). The Wisconsin court's test required a putative *de facto* parent to prove a parent-caliber relationship with the child that had formed with a biological or adoptive parent's consent and that demonstrated a direct and tangible commitment to parenting him:

> (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*In re Custody of H.S.H.-K*, 193 Wis.2d at 694–95.

When first faced with the question in *Janice M. v. Margaret K.*, 404 Md. 661, 682–85 (2008), however, the Court of Appeals declined to recognize "*de facto* parent status [as] a [] legal status in Maryland," declined at that point "to distinguish *de facto* parents from other third parties," and maintained the requirement that third parties seeking custody or visitation must show the biological parent was unfit or that extraordinary circumstances existed. *Id*. at 684–85. The Court found *de facto* parenthood inconsistent with *McDermott v. Dougherty*, 385 Md. 320, 353 (2005) and *Koshko*, 398 Md. at 437–38, two cases that involved grandparents petitioning for visitation and who, in both cases, were "pure third part[ies]," *McDermott*, 385 Md. at 356–57, distinct from the psychological or *de facto* parents recognized in other jurisdictions. *Janice M.*, 404 Md. at 685; *see also id*. at 706

7

(Raker, J., dissenting) ([*McDermott* and *Koshko*] "dealt with the rights of pure third parties, and not those of *de facto* parents."); *Koshko*, 398 Md. at 443 ("Now that we conclusively have stated in *McDermott* that parental unfitness and exceptional circumstances shall be threshold considerations in third party custody determinations, it is appropriate that we now also apply those considerations in third party visitation disputes."). Although the case arose in the context of a same-sex couple, the putative *de facto* parent in *Janice M*. didn't argue for a test specific to same-sex couples, 404 Md. at 686, and the Court seemed concerned that *de facto* parenthood would be difficult to limit. *Id.* at 685 ("Even were we to recognize some form of *de facto* parenthood, the real question in the case *sub judice* will remain, whether, in a custody or visitation dispute, a third party non-biological, non-adoptive parent, who satisfies the test necessary to show de facto parenthood should be treated differently from other third parties. We have not been persuaded that they should be."). As a result, all non-parents seeking custody or visitation were required to prove that the parents were unfit or that exceptional circumstances compelled a court-ordered override of the parents' wishes.

In *Conover*, however, the Court of Appeals recognized *de facto* parenthood and adopted the Wisconsin test. The Court grounded its decision in the fact that "the precedent was 'clearly wrong and contrary to established principles,'" "the passage of time and evolving events have rendered *Janice M*. obsolete," and that "a majority of states, either by judicial decision or statute, now recognize *de facto* parent status or a similar concept." *Conover*, 450 Md. at 77–78. Like *Janice M*., *Conover* involved a same-sex couple who "discussed having a child and agreed that [one] would be artificially inseminated from an

8

anonymous donor" whose features were similar to the other. 450 Md. at 55. They married in the District of Columbia when the child was six months old and divorced two years later. The non-biological spouse sought visitation, which the biological parent opposed. *Id.* The circuit court denied visitation, finding the non-biological parent spouse a third party who had failed to prove unfitness or other exceptional circumstances. We affirmed the circuit court's decision because *Janice M.* compelled us to:

> A non-biological, non-adoptive spouse who meets one, two or even three tests under ET § 1-208(b) is still a "third party" for child access purposes. Under *Janice M.*, he or she is not a "legal parent" . . . . He or she must still show exceptional circumstances to obtain access to a child over the objection of a fit biological parent and to overcome the natural parent's due process rights.

*Conover v. Conover*, 224 Md. App. 366, 380 (2015), *rev'd*, 450 Md. 51 (2016).

And then the Court of Appeals reversed. *Conover v. Conover*, 450 Md. 51 (2016). The Court focused first on the ongoing viability of *Janice M.* in light of intervening developments (primarily marriage equality legislation), then considered whether *stare decisis* considerations counseled in favor of affirming that decision. Its decision that *Janice M.* no longer was viable was not grounded solely in equality concerns, though. The premise was that "[t]he primary goal of access determinations in Maryland is to serve the best interests of the child," *Conover*, 450 Md. at 60 (citing *Taylor v. Taylor*, 306 Md. 290, 303 (1986)), balanced against the constitutional rights of biological parents to make decisions about the care, custody, and control of their children. *See Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923); *see also Pierce v. Society of Sisters*, 268 U.S. 510, 534–35

9

(1925). And this time, the Court held that the Wisconsin *de facto* parenthood standard balanced those rights appropriately.

A putative *de facto* parent transcends third party status when she can establish, first and foremost, "that the biological or adoptive parent consented to and fostered the petitioner's formation and establishment of a parent-like relationship with the child." *Conover*, 450 Md. at 74 (*citing H.S.H.-K.*, 193 Wis.2d at 694–95). Not just any relationship will work: the putative *de facto* parent and the child must have lived together in the same household, with the *de facto* parent taking on real parenting responsibilities over a sustained period of time. Once a biological parent allows a relationship that can meet those stringent criteria, he "does not have the right to voluntarily cultivate their child's parental-type relationship with a third party and then seek to extinguish it." *Id.* at 75. Put another way, a parent who made a conscious parenting decision to foster a parent-caliber relationship between a third party and his child can't sever that tie unilaterally—at least not when severing it harms the *child's* best interests. Or, put yet another way, a parent's consent to a prior and intentional parental relationship counterbalances (or supersedes) his otherwise preemptive right to determine whether and to what extent another adult is involved in his child's life, and turns the court's focus to the best interests of the child.[4]

---

[4] The Court also analogized the *Conover* divorce to *Monroe v. Monroe*, in which the father learned during divorce proceedings that he was not the biological parent of a child he had raised as his own throughout his marriage to the child's biological mother. 329 Md. 758, 760–63 (1993). The Court in *Monroe* fit that situation into the historical third-party analysis and found that the situation qualified as an exceptional circumstance. With the third-party hurdle overcome, the Court returned to the child: "[w]hat is important [] is the relationship that exists between the child and each of the parties" and that the relationship between the non-biological parent and child was entitled to protection "when the relationship is

10

Father urges us to read *Conover* narrowly and hold that *de facto* parent status can apply only to the non-biological parent in a same-sex couple. But nothing in *Conover* suggests that *de facto* parenthood is available only to same-sex couples. Had it chosen to, the Court of Appeals could have overruled *Janice M.* more narrowly or limited *de facto* parenthood to divorcing same-sex spouses. The Court could, for example, have held simply that the General Assembly's intervening decision to recognize same-sex marriage undermined *Janice M.*'s holding as to same-sex married couples, and therefore that they should be allowed the same opportunity to seek visitation as opposite-sex spouses.[5] It didn't.

Instead, *Conover*'s *de facto* parenthood test measures the relationship between the putative *de facto* parent and the child—a relationship formed with the biological parent's knowledge and consent—without reference to the parent's characteristics or the relationship's origins. This approach follows the analytical path of other states that recognized *de facto* parenthood long before the general recognition of same-sex marriage. Indeed, the Wisconsin case articulating the *de facto* parenthood standard the Court of Appeals adopted in *Conover*, *In re Custody of H.S.H.-K.*, 193 Wisc.2d 649 (1995), was

---

developed in the context of a family unit and is fostered, facilitated and, for most of the child's life, encouraged by the biological parent." *Id.* at 775.

[5] *See Conover*, 224 Md. App. at 391–92 ("But the premise underlying *Janice M.*'s rejection of *de facto* parenthood—that the concept can't be limited to same-sex couples—no longer holds, at least with regard to *married* same-sex couples. If, as Maryland law now provides, a valid marriage between two women (or two men) has the same legal validity and force as a man-woman marriage, courts should analyze the visitation rights of same-sex spouses the same way they analyze the visitation rights of opposite-sex spouses.") (Nazarian, J., concurring).

decided twenty-three years ago, before *any* U.S. state recognized same-sex marriages. And over the years, all sorts of people have qualified as *de facto* parents: grandparents,[6] opposite-sex step-parents,[7] boyfriends and girlfriends,[8] aunts and uncles,[9] and even, in at least one instance, a neighbor.[10] What matters, elsewhere and now here, is the relationship between the putative *de facto* parent and the child and the child's best interests, not the relationship's title or consanguinity.

The trial court read and applied *Conover* correctly. At trial, Father stipulated that Parent satisfied the first two factors of the *Conover* test, *i.e.*, that Father consented to her parent-like relationship with F and that she and F had lived together in the same household.

---

[6] *In Interest of Brandon L.E.*, 394 S.E.2d 515 (W. Va. 1990); *In re Patricia L.*, 11 Cal. Rptr.2d 631 (Cal. Ct. App. 1992); *S.S. v. Kentucky*, 372 S.W.3d 445 (Ky. 2012).

[7] *Kinnard v. Kinnard*, 43 P.3d 150, 151, 153–55 (Alaska 2002) (affirming shared-custody award to father and stepmother, who was the child's psychological parent); *Marquez v. Caudill*, 656 S.E.2d 737, 745 (S.C. 2008) (holding that stepfather was the psychological parent of his non-biological child and it was in child's best interest for stepfather to have custody of him); *Fox v. Glassing*, 386 S.W.3d 549 (Ark. App. 2011); *In re Custody of B.M.H.*, 315 P.3d 470 (Wash. 2013); *In re K.S.*, 93 A.3d 687 (Me. 2014); *In re Parentage of J.B.R.*, 336 P.3d 648 (Wash. Ct. App. 2014); *Kilborn v. Carey*, 140 A.3d 461 (Me. 2016); *McAllister v. McAllister*, 779 N.W.2d 652 (N.D. 2010); *McKenzie v. Moore*, 453 S.W.3d 686 (Ark. Ct. App. 2015); *Nunn v. Nunn*, 791 N.E.2d 779 (Ind. Ct. App. 2003); *O'Hearon v. Hansen*, 409 P.3d 85 (Utah Ct. App. 2017); *Randy A.J. v. Norma I.J.*, 655 N.W.2d 195 (Wis. Ct. App. 2002); *Riepe v. Riepe*, 91 P.3d 312 (Ariz. Ct. App. 2004); *Robinson v. Ford-Robinson*, 196 S.W.3d 503 (Ark. Ct. App. 2004); *S.A. v. C.G.R.*, 856 A.2d 1248 (Pa. Super. Ct. 2004).

[8] *DiGiovanna v. St. George*, 12 A.3d 900 (Conn. 2011); *In re Parentage of J.A.B.*, 191 P.3d 71 (Wash. Ct. App. 2008); *Middleton v. Johnson*, 633 S.E.2d 162 (S.C. Ct. App. 2006).

[9] *A.J.L. v. D.A.L.*, 912 N.E.2d 866 (Ind. Ct. App. 2009); *In re R.W. and T.W.*, 30 N.E.3d 254 (Ohio Ct. App. 2015); *Spreacker v. Vaughn*, 397 S.W.3d 419 (Ky. Ct. App. 2012).

[10] *P.B. v. T.H.*, 851 A.2d 780 (N.J. Super. Ct. App. Div. 2004).

This left the trial court only to determine whether Parent had assumed obligations of parenthood and whether she and F had a parent-child bond.

Parent met this burden easily. The trial testimony of both Father and Parent yielded ample evidence that Parent had "assumed [the] obligations of parenthood by taking significant responsibility for [F]'s care, education and development, including contributing towards [F]'s support, without expectation of financial compensation." *H.S.H.-K*, 193 Wis.2d at 435–36. When asked to describe her involvement with F, Parent did not distinguish between L, her biological child, and F. She also testified about how, even when she and Father were only dating, she had stayed awake to care for F throughout the night while she and F both had fevers. Her role in caring for F encompassed all aspects of parenthood:

> I gave him baths at night. I changed the sheets in the middle of the night when he peed the bed. I did diaper changes. I did bottle changes. I took him to dentist appointments, pediatric appointments. I did every parent/teacher that I could attend with [Father] whether he wasn't there.

> I arranged play dates. There wasn't one aspect of that child's life, other than the conversations with his biological mom and that part because I don't speak French, that I didn't, I wasn't involved in and for the most part I did, [F] would request me for bedtimes.

> I mean for the most part I did both children's bedtimes 95 percent of the time. At the time, when [F] was younger [Father] would travel a lot. I would be the sole provider of, for [F]. I picked his daycares.

> \*\*\*

> I did sign him up for camps, swim lessons. I taught him how to swim when he was an infant. I know I'm kind of jumping all over in the time frame but when he was an infant I taught him

how to blow raspberries, you know, when they are babies. To me there was no separation between the kids, [L] and [F].

***

I was in law school for three years from 2008 to 2011 so I had more flexibility in terms of daytime hours so I would do a lot in terms of picking up and dropping off [F] at daycares and then I would bring him to school.

I cooked dinners. I packed lunches. I think I always packed his lunch. . . . I was the person that did everything with [F] unless I wasn't available would be the best way to put it.

***

As I said for the preschool period I helped pick the daycares and picked some of them myself. I brought him to the first day of preschool by myself. I picked babysitters and nannies and I picked camps and paid for camps up until [Father] eventually wanted him to go to the French school but I participated in that decision. . . .

And ultimately [F] before we separated transferred back to the American system and that was with my demand actually to [Father] that he go back because I was very involved with [F]'s learning how to read and write and he was struggling with reading and we had had a lot of parent/teacher conferences that I attended where the French system just wasn't adequately helping him learn to read in 4th grade.

***

At that point in time I knew that [Father] and I were likely separating and [F] couldn't read and I didn't think the, couldn't read well and the French system just was not coping with his, his delayed reading. They weren't providing adequate, they have some extra classes but I think the language, the dual language was too difficult and so I felt that it was in [F]'s best interest to go into the American system . . . .

***

I vividly remember taking [F] to one of his first toddler appointments in the U.S. by myself, fighting with the doctor over which vaccines to gives. And then after that we didn't, I didn't like that practice and so I talked to one of [Father]'s friends and found a different practice and both of our kids to this day still use that new pediatrician.

14

> And I think for the majority of [F]'s visits to doctors I was there. As I said earlier, he was very clingy with me so to the extent that I was available and not in class or later at work I would be there and I would take time off from work for doctor's appointments as well.

***

> So I absolutely paid for [F]'s things. I don't, it's hard to, at one point I was working full time while going to law school and then I was just in law school and then I was working again so [Father] has always made a lot more money than I have but to the extent that there were expenses that I could pay for in any way I paid for them.

> My family paid for them. For instance[], camps, YMCA camps, kung fu classes, camps in Cape Cod. While I was studying for the bar exam we enrolled [F] in Laurel Day Camp in Cape Cod . . . .

***

> So I did the online bar courses and I would take [F] to camp and [Father], he might have come up for a visit that trip but I essentially was up there just me and [F].

We agree with the circuit court that Parent's unrefuted testimony demonstrates that she took significant responsibility for F's care, education, and development, and contributed to his support, without any expectation of compensation.

Parent also demonstrated that she had developed a parental bond with F by raising him with Father essentially "since he was a toddler," and that she had been a part of his life since he was approximately four months old.

> I took on every aspect of [F]'s care like he was my own child. [W]hen he was old enough to start talking because at that point in time he still had some relationship with his mother, he would attempt to call me Mom but for clarity's sake and I have a stepfather too and love my dad and my stepfather, I had him call me Becky.

> He couldn't pronounce the B. He would call me Ecky but sometimes he would call me Mom. He would call me Mom to

15

his friends at school.

Parent also described how F clung to her while he was young due to "separation anxiety from his biological mom because there was a fair amount of visits back and forth between the ages of 4 or 5 months to 2 and a half, until basically he resided full time with us . . . . For much of that time period he wouldn't even go to anyone else other than me." Parent offered numerous photos that demonstrated her close relationship both with F and her biological son, L, as well as her family's bond with F. She testified that her family also made no distinction between the two boys:

> [F] refers to my family members the same way [L] does meaning if they are called, if he calls them Auntie [F] calls them Auntie. If he calls him Grandpa, [F] calls him Grandpa.
>
> \*\*\*
>
> [W]e always vacationed in Cape Cod in the summer so that's my mom, Donnie, and Papa Joe. And he's very close with them, considers them his grandparents. He, my mother's sister, so my aunt has a house there and my cousins all come to Cape Cod and they have boys and [F] was, is incredibly close to those boys.
>
> [M, M, and N] are the boys. Their ages now are like 8 to 12 and he FaceTimes with them, adores them. They love being in the Cape together. We have thousands of pictures of the boys all at the beach, at the pool, from sunrise to sunset playing around. So that's my extended family.
>
> \*\*\*
>
> Everybody loves and misses [F] really.
>
> \*\*\*
>
> I mean he's part of the family. There's no separation.

When recounting the time when F was missing, Parent testified about the steps she personally took to secure his return:

16

> I basically didn't sleep or eat much during that time period. I went to Ivory Coast once with [Father] to try to help get him back. I wrote emails and letters to everybody I know. My family raised thousands of dollars to have, to help support getting [F]. I spoke with Senator Cardin's office. I talked to Chris Van Holland's [sic] office every single day of those 62 days. At the time I was nursing [L] and he was just an infant and the stress of that made it difficult to continue nursing.
>
> I left, it was the first time I had ever left [L]. I left him for the trip to Ivory Coast. I was unsuccessful in being able to see [F] during that visit. I actually went to his biological mother's house with [Father] attempting to see [F].
>
> I was involved every single moment trying to get to me the son that I've raised back into the country.

Since her separation with Father, Parent attempted to maintain her relationship with F, and she opined that F missed her too since he would often "stand like in the doorway to say hi. Often I notice that he's wearing clothes that I bought him" at pick-ups and drop-offs for L.

She explained her feelings for F and the importance of their bond:

> I think that [F] loves me very much and I love him very much and I think this has been really hard on him. And I think it's in the interest of both kids to be seen as brothers. They think of themselves as brothers . . . . [Since the separation I am] a better mom to my kids and I know that I will provide so much love and guidance to [F] and continue to do so until I die. And I just, I don't know how these kids will make it through the next 10 years being different from each other.
>
> ***
>
> And also, it's not fair that [L] has the benefit of a mom in his life every day, even if some of those days are on Facetime and [F] doesn't get that benefit.

In his testimony, Father expressed concern about Parent's commitment to F after their marriage dissolved, but still expressed willingness to let Parent have a relationship and visits with him. Nor did Father contradict any of Parent's testimony about her care of F.

Father was concerned that "[F]'s emotional or ego will be if he is taken from both his biological parents and given to someone non-biological. Is he rejected by both of his parents? You know." But in the end, Father didn't actually object to visitation: "[Parent] can have some visits during the weekend."

The testimony and evidence at trial easily support the trial court's conclusion that Parent satisfied the *Conover* test and qualified as F's *de facto* parent. From there, the decision to award visitation turned on whether it was in F's best interests that he have visitation with Parent. And here too, the court got it right. The court applied the factors identified in *Taylor v. Taylor*, 306 Md. 290 (1986), and *Montgomery Cty. Dep't of Soc. Servs. v. Sanders*, 38 Md. App. 406 (1977),[11] and dedicated six pages of its order to analyzing F's best interests against those factors. The court noted that "the best interests analysis for [L] and [F] is similar, if not identical, in many respects." The court found that

---

[11] These include: the fitness of the parents; the character and reputation of the parties; the requests of each parent and the sincerity of the requests; any agreement between the parties; the willingness of the parties to share custody; each parent's ability to maintain the child's relationship with the other parent, siblings, relatives, and any other person who may psychologically affect the child's best interest; the age and number of children in household of each parent; the preference of the child (when the child is of sufficient age and capacity to form a rational judgment); the capacity of the parents to communicate and to reach shared decisions affecting the child's welfare; the geographic proximity of the parents' residence and opportunities for time with each parent; the ability of each parent to maintain a stable and appropriate home for the child; the financial status of the parents; the demands of parental employment and opportunities for time with the child; the age, health, and sex of the child; the relationship between the child and each parent; the length of the separation of the parents; whether there was a prior voluntary abandonment or surrender of custody of the child; the potential disruption of the child's social and school life; any impact on state or federal assistance; the benefit a parent may receive from an award of joint physical custody, and how that will enable the parent to bestow more benefit upon the child; any other consideration the court determines is relevant to the best interest of the child. *Taylor*, 306 Md. at 307–312; *Sanders*, 38 Md. App. at 420.

both parents were fit to care for F, if prone to communication difficulties. The court found that granting Parent visits with F would have little to no negative impact on his daily schedule or life. And in weighing their respective positions, the court found that Father's reasons for opposing visitation were "motivated by anger toward [Parent] . . . rather than by that which is in [F]'s best interests." Having correctly found Parent to be F's *de facto* parent, we see no abuse of discretion in its decision to allow her visitation with F.

**B.** **The Trial Court Appears To Have Applied The Wrong Income Figure When Calculating Child Support for L.**

On March 18, 2016, Father and Parent entered voluntarily into the Agreement. Among its terms, Father agreed to pay Parent $300 a month for L's care. This amount fell below the recommended child support schedule for their salaries; even so, Father accumulated $11,114 in child support arrears as of November 1, 2017. As part of her Complaint, Parent requested "that the Court recalculate child support for [L] based on the Maryland Guidelines, rather than using the $300 per month amount to be paid by [Father] under the Agreement."

At trial, Parent testified that her monthly salary at the time of the Agreement was $5,069. Since then, however, her salary increased to a new monthly figure of $6,434.66. In her closing argument, Parent's attorney stated that "[she] put open her current pay information and that was established at $5,069 per month" and that Father's income was "$11,461 per month." After factoring in Parent's payments of $700 per month for L's child care costs and Father's payments of $172 per month for L's health insurance cost, the child support guidelines indicate a monthly child support payment for L (by Father) of $1,057.

19

Parent's attorney also provided a child support worksheet to the circuit court as an aid using those numbers. And the circuit court found "that it is in [L]'s best interests to recalculate child support pursuant to the Maryland Guidelines" because the guidelines child support amount of $1,057.00 per month would mean "he would be receiving the benefit of more than $700 more per month in support." Father contends now, however, that the court erred when it used Parent's older, and lower, salary figure to calculate child support, and we agree.

The child support guidelines are designed to "remedy the low levels of most child support awards relative to the actual cost of rearing children" and "improve the consistency and equity of child support awards." *Tannehill v. Tannehill*, 88 Md. App. 4, 11 (1991). If the parties' combined monthly income is $15,000 or less, the court is required to follow the Guidelines. MD. CODE, FAM. LAW ("FL") § 12-204(e); *see also Smith v. Freeman*, 149 Md. App. 1, 19 (2002). If the parties' combined income is above $15,000, the trial court can use its discretion. FL § 12-204(d); *Smith*, 149 Md. App. at 19. There is, however, "a rebuttable presumption that the amount of child support which would result from the application of the child support guidelines set forth in this subtitle is the correct amount of child support to be awarded," unless "rebutted by evidence that the application of the guidelines would be unjust or inappropriate in a particular case." FL § 12-202(a)(2)(i)-(ii).

So "in above Guidelines cases, calling for the exercise of discretion, the rationale of the Guidelines still applies." *Malin v. Mininberg*, 153 Md. App. 358, 410–11 (2003). If the trial court chooses to adopt an above-the-Guidelines child support amount, the judge "must balance the best interests and needs of the child with the parent's financial ability to meet

20

those needs." *Unkle v. Unkle*, 305 Md. 587, 597 (1986); *see also Collins v. Collins*, 144 Md. App. 395, 443 (2002). We review the trial court's discretionary determination of child support for abuse of discretion or legal error. *Ware v. Ware*, 131 Md. App. 207, 240 (2000).

The question here is less about the formula than the inputs. Because either salary figure for Parent, $5,069 or $6,434.66, combined with Father's confirmed monthly salary of $11,461, exceeds $10,000, the trial court had the discretion to set child support where it thought appropriate. It appears, though, that the trial court intended to grant Parent the Guidelines-recommended amount of child support, but used the numbers in the child support worksheet provided by Parent's attorney, which utilized the lower salary figure. When the worksheet is completed using her actual current salary (and leaving all of the other figures the same), the resulting child support figure drops from $1,057.00 per month to $876.34. Because the court did not specify why it chose Parent's dated salary in the calculation—or, perhaps more precisely, that it did so intentionally—we remand to the trial court with directions to vacate the child support award as to L and re-calculate support using Parent's updated salary figure or explain its rationale for using the older figure (and child support shall continue as ordered in the meantime).

## C. The Court Did Not Err In Awarding Joint Legal Custody Of L With Tie-Breaking Authority To Parent.

*Finally*, and although Father sought joint legal custody of L and doesn't challenge that decision, he does object to the trial court's decision to grant Parent tie-breaking authority. He contends that tie-breaking authority should be granted only in extreme situations, as it "robs the other parent of any semblance of joint legal custody," relying on

21

*Joint Legal Custody With "Tie-Breaking Authority" or "Final Say" Isn't Joint Legal Custody*, (Utah Family Law TV broadcast Jan. 25, 2016) and *Downing v. Perry*, 123 A.3d 474 (D.C. App. 2015). He acknowledges, as he must, that joint legal custody with a tie-breaker "has unquestionably been recognized in Maryland." *Santo v. Santo*, 448 Md. 620, 632–33 (2016); *see also Shenk v. Shenk*, 159 Md. App. 548, 560 (2004). We see no abuse of discretion in the court's decision to award tie-breaking authority here.

Legal custody encompasses "the right and obligation to make long range decisions involving education, religious training, discipline, medical care, and other matters of major significance concerning the child's life and welfare." *Taylor v. Taylor*, 306 Md. 290, 296 (1986). Likewise, "[j]oint legal custody means that both parents have an equal voice in making those decisions, and neither parent's rights are superior to the other." *Id.* Although often preferable to vesting sole legal custody in one parent, joint legal custody can be challenging because "[c]onflicts in the post-divorce period typically revolve around one or more of several areas including unresolved marital issues, lingering anger and hurt about the divorce, conflicts with or over new partners, or fruitless power struggles that revolve only around efforts to 'win' over the ex-spouse, such 'wins' often being a Pyrrhic victory." *Shenk*, 159 Md. App. at 559.

Tie-breaking authority "proactive[ly] [] anticipate[s] a post-divorce dispute." *Id.* at 560. The tie-breaker can and should only be used when both "parties are at an impasse after deliberating in good faith" and by "requir[ing] a genuine effort by both parties to communicate, as it ensures each has a voice in the decision-making process." *Santo*, 448 Md. at 632–33. We review a trial court's custody determination for abuse of discretion,

*Petrini v. Petrini*, 336 Md. 453, 470 (1994), and we reverse only when the court's ruling is "clearly against the logic and effect of facts and inferences before the court." *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312 (1997) (cleaned up).

Before the divorce hearing, Father and Parent shared joint legal custody of L under the terms of their Agreement. At the hearing, Parent requested tie-breaking authority and joint legal custody, or, in the alternative, legal decision-making regarding L's education, and Father requested sole legal custody. Before modifying any agreement "with respect to the care, custody, education support of any minor child of the spouses," a trial court must determine "if the modification would be in the best interests of the child," FL § 8-103(a), applying the factors outlined in *Taylor* and *Sanders*.

The trial court order granting joint legal custody with tie-breaking authority to Parent appropriately took the various factors and L's best interests into account. The court found that both were fit parents who cared deeply for their son, but that they suffered from communication issues that prevented L from taking full advantage of the opportunities they could provide. As it analyzed the parents' capacity to communicate and reach shared decisions about L's welfare, the court explained in detail how Father's behavior and testimony led it to conclude that "the ability of the parties to communicate is weak":

> The testimony and evidence adduced at trial demonstrate that [Parent] has the capacity to communicate with [Father] to reach shared decisions regarding [L] and has repeatedly attempted to do so. On the other hand, [Father] is often hostile toward [Parent] and does not communicate well with her at all. For example, [Parent] testified and the Court believes, [Father] is hostile and angry over the break-up of their marriage and blames [Parent] for its demise. [Parent] testified [Father] has regularly called her a cheater and a liar, sometimes in front of

23

the children. [Father] testified to at least two loud arguments between the parties, one in which she was forced to call [Father]'s father for help. While [Father] disagreed with certain portions of [Parent]'s testimony regarding his behavior during these arguments, he did not deny they happened. In addition, [Parent] testified after signing the Agreement, [Father] shut down communication between the parties completely and has at times refused to be in the same physical space as [Parent]. During transitions with [L], [Parent] testified [Father] has slammed the front door of the residence, thrown the child's shoes on the porch and installed a camera at the front door to record the [Parent]'s arrivals and departures at transition times. [Parent] testified at length regarding her inability to discuss with [Father] [L's] best interests. For example, vacations, weekend events, school events, summer camps, soccer were all raised by [Parent] to [Father] with virtually no response from [Father]. As such, vacations, weekend events, school events, summer camps and soccer opportunities came and went because [Father] simply refused to communicate with [Parent] about them.

In addition, the trial court found that Father was "at times angry, untruthful, vindictive and mean-spirited toward [Parent]." The court found "that certain aspects of [Father]'s testimony were not credible" and that some of Father's actions during the hearing "further add[ed] to the Court's doubt regarding [Father]'s veracity." As such, the court found that Father's "requests [were] motivated more by his anger toward [Parent] rather than what [Father] believes to be [L's] best interests." Finally, the trial court noted that "at trial [Father] conceded that he was willing to share both legal and physical custody [of L] with [Parent]."

In light of the undisputed communication challenges between the parties and the trial court's first-hand observations of the parties during trial, we see no abuse of discretion in the court's decision to award joint legal custody with tie-breaking authority to Parent.

Tie-breaking authority is not a rare or extraordinary measure, but is appropriate in situations like this when parents have difficulties communicating and acting in the best interests of their child.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED EXCEPT AS TO CHILD SUPPORT FOR L, WHICH IS REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLANT TO PAY COSTS.**